## SOUTHERN TRAVELERS' ASS'N v. BOYD. (No. 2912.)

Court of Civil Appeals of Texas. Amarillo. Nov. 30, 1927.

Rehearing Denied Jan. 4, 1928.

**1. Insurance** &=296—Altering and pressing clothing held within meaning of "tailoress" in application for accident insurance.

Duties consisting of altering clothing and pressing them *held* within meaning of term "tailoress" in application for accident insurance policy, since restricted definition that tailor is one whose occupation is to cut out and make men's or women's outer garments was inapplicable, and insured did not deceive association in signing application stating that her occupation was that of tailoress.

**2. Insurance** &=378(3), 646(5)—Agent soliciting accident insurance was presumed to know insured's duties, and his knowledge was constructive knowledge of insurance association.

Agent soliciting accident insurance and discussing character of insurance insured working in tailor shop would need was presumed, in absence of fraud, to know duties constituting insured's occupation, and this actual knowledge was constructive knowledge of insurance association.

**3. Insurance** &=379(4) — Representation regarding insured's occupation, made by agent without suggestion from insured, if erroneous, did not avoid accident policy.

Representation in application for accident insurance that insured was tailoress, made by agent soliciting insurance without any sugges-

tion from insured, if erroneous, did not avoid insurance contract, and this is true even where it is stipulated in policy that agent shall be considered as agent of insured.

**4. Insurance ⬤⟿339 — Engaging temporarily during evening in another vocation did not constitute "change of vocation" from one stated in accident insurance application, requiring notice under by-laws of insurance association; "occupation."**

Where insured whose regular occupation was that of altering and pressing clothing in tailor shop was injured while temporarily working for laundry in evening, there was no "change of vocation" from occupation stated in application under by-laws of insurance association requiring notice of change to association, since word "occupation" has reference to principal and regular business of man's life, that to which he devotes his time and attention, such as trade, profession, or other vocation or calling.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Change; Occupation (Vocation).]

**5. Insurance ⬤⟿531—Insurer not furnishing insured classifications of hazardous occupations could not claim insured, injured in temporary occupation more hazardous than one stated in application, was disqualified from receiving full insurance.**

Where by-laws of accident insurance contract were made part of contract and provided that insured was entitled to certain percentages of full amount of insurance where injured while engaged in temporary vocation more hazardous than one stated in application, insurance association failing to furnish insured with classifications of hazardous occupations so she could guard against engaging in such occupations could not claim insured, injured while engaged temporarily in more hazardous occupation, was not entitled to full amount of insurance, since it was insurer's duty to furnish classifications.

**6. Insurance ⬤⟿531—Where accident insurance certificate withheld from insured amount payable, amount could not be reduced under by-law provision because injury occurred during temporary employment in more hazardous occupation (Rev. St. 1925, art. 4797).**

Where accident insurance certificate violated Rev. St. 1925, art. 4797, by withholding from insured information of amount to be payable in any event, insurer could not claim that insured was disqualified from receiving full insurance by by-law made part of contract, where insured was injured while engaged in more hazardous occupation than one stated in application.

**7. Insurance ⬤⟿672—Where accident policy provided for payment only in installments, judgment for lump sum was erroneous.**

Where plaintiff sued upon contract of accident insurance providing that amount of benefit should be payable in monthly payments and contained no provision for lump sum settlement, and none was pleaded by plaintiff, trial court erred in rendering judgment for lump sum.

Appeal from District Court, Potter County; W. E. Gee, Judge.

Action by Mrs. Mary E. Boyd against the Southern Travelers' Association. From a judgment for plaintiff, defendant appeals. Affirmed as reformed.

Works & Bassett, of Amarillo, Geo. Mendell, Jr., of Austin, and Joseph E. Gilbert, of Dallas, for appellant.

Coper & Lumpkin, of Amarillo (C. F. Cornell, of Dallas, of counsel), for appellee.

RANDOLPH, J. This suit was brought by Mrs. Boyd against the appellant association to recover on an insurance policy. All matters of fact were submitted to the trial court, and that court rendered judgment for the plaintiff, and defendant has appealed to this court.

Mrs. Boyd was employed in Patton's tailoring establishment. Her duties there consisted in altering clothing and pressing it. She testifies:

"My principal work was just what I said—alterations and repairs. I would alter them, I would press them. I would alter clothes that had been worn and new ones that would have to be altered before they were delivered. The press that I would use was a Hoffman, which operated by a little lever by shoving that lever with your foot. It was controlled by that lever. That was used in pressing coats and pants and such things. When I wanted to use it, I turned the power on to it, and I could cut it off when I wanted to stop it. It is worked with your hand, but you have to use your hand and your foot. It was not run by electric power, it was run by steam, I think—I am not sure. The power stayed on from morning till night. I did not turn the power on or off as I desired, but the power was always on, and I operated the press when I wanted to use it."

Mr. Buron, an agent of the association, who was soliciting insurance from Patton, the owner of the shop, discussed with Mrs. Boyd the character of insurance she should get. He took her application, and later Mrs. Boyd received a certificate of insurance from the association.

At the time Mrs. Boyd was injured, she was engaged in work for the Troy laundry. It appears from the evidence that she had, before going to work for Patton, worked for the laundry, and that on the occasion of the injury she had, at the request of the laundry, gone down after work hours at Patton's to help the laundry people out. That night as she was temporarily assisting them and was engaged in operating the press and had been at work about 2½ hours, an electric wire in the motor burned in two and caused the press to fall on her hand and arm, severely burning her arm from the elbow to her fingertips. This burn later necessitated an operation whereby she lost her hand and a part of her arm.

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

In the plaintiff's application for insurance, in answer to the question as to what was her occupation, it is stated that she is a "tailoress." The association contends that a tailor, as defined by Mr. Webster, is "one whose occupation is to cut out and make men's or women's outer garments," and that as Mrs. Boyd's duties were not those of a tailor, as thus defined, she had untruthfully answered the question as to her occupation, and that she was, in fact, not an insurable person, and by thus answering had breached her warranty in her application, thus voiding the policy.

The evidence discloses, as above stated, that the agent of the association was soliciting Patton for insurance, and while doing so, discussed the question of insurance with Mrs. Boyd. She testifies:

"At the time Mr. Buron took my application for this insurance, he filled out the blanks on the application and I signed my name to it. I did not tell him, at that time, what my duties were —what I was doing there, and I did not ask him. He seen what I was doing and he filled those blanks out himself. * * * He did not say anything to me about the classification of the occupation. I did not tell him I was a tailoress, he put that down himself. He just wrote tailoring."

[1] It is evident from this undisputed testimony that the agent himself defined Mrs. Boyd's occupation from what he observed there. In the classification, given in the "Health and Underwriters' Manual," which we will discuss later, under the heading "Tailor," the association defines the duties of tailor, and among those named are "cleaner and presser" and "cutter"—thus recognizing the duties of that occupation—and the agent was not only authorized by the facts of Mrs. Boyd's vocation, but also by this classification, to so classify her occupation.

It is therefore apparent that the restricted definition quoted above is not applicable here. Hence Mrs. Boyd, in signing the application containing such designation of her occupation, was not guilty of deceiving the association and of practicing a fraud on them, and there was no breach of her warranty that the statement therein contained, that she was a tailoress, was true.

Section 1, art. 2, of the by-laws of the association, relative to membership, provides as follows:

"Section 1. Any white person of good character and good health and between the ages of 18 and 55 years, whose application for membership signifies such person is not engaged in any business more hazardous than those designated in the application, or from time to time by the board of directors, may be eligible to membership in this association as hereinafter defined, when accepted by the board of directors or committee thereof."

Under the heading of "Those Eligible to Membership," the application signed by Mrs. Boyd provides:

"Any white man or woman, within the age limit of 18 to 55 years, whose occupation in the Mutual Manual of Health and Accident Association is rated as a class A 'select' or class B 'preferred' risk of good moral character, and sound in mind and body, is eligible to membership in this association."

As to Mrs. Boyd's eligibility to membership in the association, no question is raised except that of the falsity of her representation as to her occupation, and that the facts of her occupation place her outside of insurable classification. This has been discussed above and the contention is overruled.

We do not think the case of Judd v. Lubbock Mutual Aid Association (Tex. Civ. App.) 269 S. W. 284, is in point here, or that the rule laid down in that case applies to the facts of this case. In the Judd Case, the insured was in the last stages of pulmonary consumption at the time application was made for insurance. He well knew his condition, having been so informed by his physician. His wife, who was the beneficiary of the insurance, and his cousin, who filled out and signed the application for him, also knew it. This court held that, notwithstanding the jury's finding that the cousin was the agent of the association, such finding did not necessarily, as a matter of law, settle the question of agency, but that if the cousin of the insured had knowledge of the bad health of the insured, it could not be imputed to the association, for the reason that he was acting against the interest of the association and was engaged in perpetrating a fraud on them in favor of his kinsman, the insured. In that case, it was held that the representations as to the health of the insured constituted a warranty of the truth of the statement, and in view of the falsity of the statement the association was not bound by the certificate of insurance. In the case at bar, there was no misrepresentation, intentional or otherwise, on the part of Mrs. Boyd, and no fraud, express or implied, can rightly be laid to her charge.

In the case of Schumann v. Brownwood Mutual Life Ass'n, 286 S. W. 200, the controlling question was whether or not the insured gave his age correctly in answering the agent's question, and the Commission of Appeals, with the express approval of the Supreme Court, held that where answers to questions in applications for membership were written by insurer's agent, no duty rested upon the insured to see that the answers were correctly written.

[2] As stated above, Mr. Buron, the agent of the association, was in Patton's tailor shop, soliciting insurance, and then and there discussed the character of insurance Mrs. Boyd would need, and we can therefore presume, in the absence of fraud on his part or her part, that he was aware of the duties constituting Mrs. Boyd's occupation, and this actual knowledge of the agent is held to be

constructive knowledge of the association. 1 C. J. 406, § 8.

[3] If the representation that Mrs. Boyd was a tailoress was erroneous, it was made by Buron without any suggestion from Mrs. Boyd, and will not have the effect to void the contract. This is true, even where it is stipulated in the policy that the agent shall be considered as the agent of the insured. 1 C. J. 423.

Where an agent, duly authorized to solicit insurance, either fraudulently or negligently inserts in an application false answers to questions correctly answered by the applicant, the agent's wrong will be imputed to the insurer. North Am., etc., Co. v. Trenton (Tex. Civ. App.) 99 S. W. 740.

[4] The application for insurance made by Mrs. Boyd expressly provides that the laws of Texas, the charter of the association, the by-laws, and the certificate shall constitute the contract of membership in the association. Section 6 of the by-laws of the association provides as follows:

"Sec. 6. Whenever any member of this association shall engage in a business of vocation different from that which is stated in his application, or is shown by the record of this association, he shall immediately thereafter send to the secretary a written notice of the fact, describing fully his new business or vocation, and the directors shall, at their discretion, continue or cancel the membership of such member, and his membership shall cease and determine on the tenth day after engaging in such new business or vocation, without the action of the board of directors, unless he shall, in the meantime, have sent such written notice."

"So engaging temporarily, accidentally, or casually in another business or vocation, with no intention of abandoning that specified in the contract, but to return thereto, does not constitute a change of business or vocation, within the intent of these words, in a condition requiring notice to and consent of the society in case of such change to prevent a forfeiture." 4 Joyce on Insurance, § 2236.

"The word 'occupation' has reference to the principal or regular business of a man's life, that to which he devotes his time and attention, such as trade, profession, or other vocation or calling. This being true, the agreement introduced into evidence simply showing that the deceased, who was a farmer when he joined the order, thereafter for a length of time not stated, 'engaged in mining,' and that he was employed in a mine when he was killed, does not show that he had changed his occupation—the principal business or work of his life—from that of farming to mining." Sov. Camp W. O. W. v. James (Tex. Civ. App.) 230 S. W. 435.

[5] The appellant assigns error on the part of the trial court in rendering judgment for the full sum of $1,500 for the loss of her hand, when, under the provisions of article 3, § 4, subd. (p), of said by-laws, reading as follows:

"(p) When a member of this association engaged temporarily or just for the moment in a 1 S.W.(2d)—29

business or vocation more hazardous than the one stated in his application, or as shown by the records of this association, and an accident, as defined by the by-laws, should occur, said member is not debarred as a member, nor from participating in benefits (as specified in article 2, § 6), by said member, or shall be entitled to benefit for such amount as herein named, covering classes designated by the Health and Accident Underwriters' Manual for more hazardous risks in lieu of full benefits as provided in application and these by-laws. The more hazardous risks as referred to are as follows:

Class C, 'ordinary,' 75 per cent.,
Class D, 'medium,' 50 per cent.,
Class E, 'special,' 25 per cent.,
Any others, 'hazardous,' 10 per cent.

—of the amount provided for in this article, section 1, section 2, or section 3, for accident benefit."

It is provided that, under such conditions, the insured would be only entitled, at the very most, to $750.

It appears, from the evidence, that the only papers or documents that ever came to the hands of Mrs. Boyd were the application and the certificate of insurace, with a copy of the by-laws attached thereto. It is true that she agreed that the laws of Texas, the application signed by her, the certificate from the association, and the association's by-laws should constitute the contract between herself and the association. As shown by the article just above quoted, there is a limitation upon the amount of insurance to which she was to be entitled under a temporary hazardous employment, but the manual to which the by-laws refer was never furnished her, and she never had an opportunity afforded her to read the manual.

The secretary of the association at Dallas testified:

"My name is J. V. Hardy, and I am secretary of this defendant company. I have been connected with the company, as secretary, ever since its organization December 5, 1922.

"I have had other insurance experience—worked at the business with other traveling men's organizations for 30 odd years. During my work in these lines, I have made a study of this class of insurance, and am familiar with the rate books and mortuary tables used by life insurance companies and accident insurance companies.

"I am familiar with the manual referred to on page 9, paragraph (p), of the by-laws of defendant company. This is used, generally, by accident insurance people in determining the classes; it is used commonly and generally in this country.

"It is styled 'Health and Underwriters' Manual' at different places. The trade-mark is registered. It is Health and Accident Manual of the Underwriters' Committee. That is the one we use, and the only one we use. It is classifications and instructions. A part of it is an official classification manual. The classifications are on the inside; there are the classifications right there.

"We furnish these to the solicitors, and to the policyholders whenever they request them, like

we do the by-laws when they request them. The solicitors always have them as a guide. The solicitors are what they are for. They cost 19 cents apiece and are too costly to send out promiscuously. The solicitors are asked and required to use the classification, so that when that classification is used, it means what it says to the board of directors; if it varies from that, then, of course, there is a complication. There are three books used in different parts of the country, and this is one of them that is used down in this country, but it costs too much to send to individual members. We send it to them, however, to look over and ask them to return it to us and not keep it. If they want to keep it, of course they can, as they have it in their possession. We do not furnish it just like we do the by-laws; they are furnished whether requested or not, but we do not furnish this unless they request it.".

There rested upon the insurance company the duty of furnishing these classifications of hazardous occupations to its members that they might have knowledge necessary to guard them against engaging, even temporarily, in such occupation as would disqualify them from receiving full insurance, but this the company did not do, because each of those manuals cost 19 cents. Again, it is indefinite as to which manual this limitation of employment is contained in. Hardy testifies that the manual is styled "Health and Underwriters' Manual" at different places; that it is registered as "Health and Underwriters Manual of the Underwriters' Committee." At the same time he testifies:

"There are three books used in different parts of the country, and this is one of them that is used down in this country."

It appears, therefore, that the association refuses the cost of these manuals, but makes its members pay the penalty for not acting upon the information contained in them.

[6] There is yet another reason why the appellant's contention that the amount of the insurance should be reduced by the last-quoted provision of the by-laws should not be sustained. The certificate issued to Mrs. Boyd is, in words, as follows:

"('STA' in Swastika.)

"Your Paymaster in Time of Need.

"Specifications:        Classes E and F.
"Class E—Accidents—All kinds.
"Class C—Accidents—Automobiles, all kinds.
"Class A—Accidents—All kinds.
"Class B—Sickness and most diseases.
"Class D—Burial fund.

"No. 1903

"Southern Travelers' Association.

"A Mutual Health and Accident Association.

"Dallas, Texas.

"This certifies that Mrs. Mary E. Boyd is a member of the Southern Travelers' Association, and while in good standing is entitled to benefits in such amounts, and under such conditions and limitations as may be provided for in the articles

of incorporation and by-laws of said association in force on the date of the happening of the event on account of which any claim, under this certificate, is made; said articles of incorporation and by-laws, the application for membership, and this certificate shall constitute the contract between the holder hereof and said Southern Travelers' Association.

"'The payment of the benefit herein provided for is conditioned upon its being collected by this company from assessments and other sources as provided in its by-laws.'

"In witness whereof, we have hereunto affixed our official signatures and impressed the corporate seal of the association at Dallas, Texas, this 15th day of March, A. D. 1926.

"[Seal.]        F. H. Kidd, President.
                "J. V. Hardy, Secretary."

Indorsed:

"No. 1903.

"Membership Certificate.

"('STA' in Swastika.)

"'Your Paymaster in Time of Need.'

"Southern Travelers' Association,
        Dallas, Texas.

"Issued to Mrs. Mary E. Boyd, Amarillo, Texas.

"Notice.

"Members of classes E, C, or A, Accident, must call a physician immediately, and notify the office of the secretary within 30 days, to recover benefits herein.

"Members of class B, Sickness and Diseases, receive benefits after first personal visit of a physician and must notify the office of the secretary immediately, to receive benefits herein.

"The beneficiary of class D, Burial Fund, which is an auxiliary, will get remittance by wire or messenger immediately upon confirmation of death of a member without delay or waiting for detailed proof."

Article 4797, R. C. S. 925, provides as follows:

"Art. 4797. (4807)  *Policy Shall Specify What.*  Every policy or certificate issued by any such corporation shall specify the sum of money which it promises to pay upon the contingency insured against, and the number of days after the receipt of satisfactory proof of the happening of such contingency at which such payment shall be made. Upon the happening of such contingency, such corporation shall be liable for the payment of such amount in full at the time so specified, subject to such legal defenses as it may have against same. * * *"

It appears, therefore, that the certificate violates this statute and withholds from the insured any information of the amount of money to be payable in any event, and again violates the provision that the contract between the parties is constituted by the articles of incorporation, the by-laws, the application, the certificate, and the laws of Texas, and furnishes to insured no information as to any penalty to be incurred by her in thus temporarily engaging in another occupation.

[7] The plaintiff in this case sued upon a

contract of insurance, which provided that the amount of benefit payable should be payable in monthly payments. This contract contained no provision for a lump sum settlement, and none is pleaded by the plaintiff. Consequently, the sum of $1,500 recovered by Mrs. Boyd was payable in 30 monthly installments, which would be $50 per month for 30 months. The trial court therefore erred in rendering judgment for the full sum of $1,500. As it appears that Mrs. Boyd was injured on July 6, 1926, and that 16 monthly payments are now due and unpaid, and that 14 monthly payments are not yet due, it is ordered that the trial court's judgment be here reformed so that the plaintiff, Mrs. Boyd, recover of and from the defendant association the sum of $800, and further, that the residue of said sum of $1,500 be and is hereby ordered paid in monthly payments of $50 each, beginning on the 6th day of December, 1927, with interest at the rate of 6 per cent. per annum on the monthly payments as they have heretofore become due and payable, and, as here reformed, the trial court's judgment is affirmed.

The question here decided not having been submitted to the trial court as error, it is ordered that the appellant association pay all costs of court including the costs of appeal to and in this court.