# Richmond

## Southwest Virginia Hospitals, Inc., Et Als. v. James C. Lipps[*].

December 3, 1951.

Record No. 3817.

Present, All the Justices.

---

[*] Reporter's Note—Rehearing granted March 10, 1952.

The opinion states the case.

*Wm. A. Stuart,* for the appellants.

*Fred B. Greear* and *Flannagan & Flannagan,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

The decree complained of was entered June 20, 1950. Appellants filed their notice of appeal and assignments of error on August 25, 1950.

The appellee has moved to dismiss this appeal on the grounds, first, that the decree appealed from was final and appellants did not file their notice of appeal and assignments of error within sixty days after its entry, Rule of Court 5:4; and, second, failed to execute a proper bond allowing suspension of execution of the judgment granted in said decree. The grounds of the motion are without merit.

It will be observed from the recitals of the decree, hereinafter set out, that it adjudicates the principles of the cause, and was, therefore, appealable pursuant to the provisions of Virginia Code, 1950, section 8-462 (2) (c). However, it lacks the essentials of a final decree in that it does not dispose of the whole subject of the suit, does not give all of the relief contemplated, nor provide for giving effect to its sentence. 4 Minor's Institutes, 1878 Edition, page 860. It decides one of the major issues in the cause and leaves two others for future determination on the merits. It is, therefore, interlocutory, and its nature is not changed by the fact that an appeal could be taken from it. *Noel* v. *Noel,* 86 Va. 109, 112, 9 S. E. 584; *Allen* v. *Parkey,* 154 Va. 739, 748, 149 S. E. 615, 619, 154 S. E. 919; *Mann* v. *Clowser,* 190 Va. 887, 895, 59 S. E. (2d) 78.

In *Ryan* v. *McLeod,* 32 Gratt. (73 Va.) 367, 376, the rule which we have consistently followed is stated as follows:

■ "According to the uniform decisions of this court, a decree which disposes of the whole subject, gives all the relief that is contemplated, and leaves nothing to be done by the court, is only to be regarded as final. *Vanmeter* v. *Vanmeter,* 3 Gratt. (44 Va.) 148; *Harvey* v. *Branson,* 1 Leigh (28 Va.) 108. On the other hand, every decree which leaves anything in the cause to be done by the court, is interlocutory as between the parties remaining in the court."

The appellee, in his brief, concedes that the decree is interlocutory as to Southwest Virginia Hospitals, Inc.; but denies that it is final as to remaining appellants. The decree makes no distinction between the Corporation and the remaining appellants. Its provisions apply to all equally.

■ Where an interlocutory decree is appealable as adjudicating the principles of the cause, the aggrieved party is not limited to the period for perfecting an appeal from a final decree, but may appeal any time until final decree is entered and the time for an appeal therefrom has elapsed. *Hess* v. *Hess,* 108 Va. 483, 486, 62 S. E. 273; *Richardson* v. *Gardner,* 128 Va. 676, 684, 105 S. E. 225; 1 Freeman on Judgments, 5th Ed., section 38, pages 63, *et seq.,* section 42, page 69.

■ As to the second ground of the motion to dismiss, it is settled in Virginia that the right of appeal is not affected by any defects or insufficiencies in the suspending bond or by the failure to give any suspending bond.

In *Patterson* v. *Old Dominion Trust Co.*, 149 Va. 597, 140 S. E. 810, 141 S. E. 759, we said: "The law of this State does not require a decree to be suspended or a bond given in order to apply for an appeal therefrom, and the omission to do either does not deprive the aggrieved party of that right."

This proceeding involves a construction of the terms and provisions of an employment contract and an accounting between the parties to the contract.

Appellants are Southwest Virginia Hospitals, Inc., a non-stock corporation, not organized for profit, hereinafter called the Corporation, and fifteen hospitals located in the southwestern area of Virginia, hereinafter called participating hospitals or hospitals. The Corporation is an agency organized (Virginia Code, 1950, section 32-190, Acts 1940, page 376) to administer a group hospitalization plan, including medical and surgical services, hereinafter referred to as the Plan, to such persons as qualified for said service, by the payment of a stipulated sum of money each month. Its board of directors consisted of one representative, usually a doctor, from each of the participating hospitals. The appellee, James C. Lipps, was the managing director of the Corporation and its sole administrative official under a written contract, which defined the duties and obligations of the parties.

Upon the termination of the contract between Lipps and the Corporation in 1947, this controversy arose. The circumstances surrounding the termination are hereinafter set out.

Southwest Virginia Hospitals, Inc., instituted this action in December, 1947, against James C. Lipps and the New Amsterdam Casualty Company, surety on the bond of Lipps for the faithful performance of his duties. Its bill alleged that Lipps had quit his employment and ceased to perform his duties on October 27, 1947. It prayed for a mandatory injunction against Lipps requiring him to refund to the complainants $10,857, allegedly withdrawn without right or authority from the bank account of his employers; for discovery from Lipps of the state of its accounts with its customers; the reference of the cause to a special commissioner to ascertain and state accounts between the parties; and for other relief. The trial court granted a temporary injunction requiring Lipps to refund the $10,857. Thereafter, the complainant filed an amended and supplemental bill, denying that it was liable to Lipps for large sums of money

claimed by Lipps on account of an alleged breach of his contract and for services rendered, and averring that Lipps was liable to it for losses caused by his improper conduct in the performance of his duties, and for moneys collected on its behalf and unlawfully withheld.

Fifteen participating hospitals of the Corporation—Coeburn Hospital, George Ben Johnston Memorial Hospital of Southwest Virginia, Inc., Lee Memorial Hospital, Grundy Hospital, Lebanon General Hospital, Lee General Hospital, Inc., Mattie Williams Hospital, Norton General Hospital, Clinch Valley Clinic Hospital, Dickenson County Hospital, Dr. Botts' Eye, Ear, Nose and Throat Hospital, Norton Clinic, Pulaski Hospital, Inc., St. Elizabeth's General Hospital, and Waddell Hospital—by their respective owners, filed a petition asking to be made parties complainant to the proceeding, alleging that since Lipps was contending that he had a cause of action against them as well as against the Corporation, and was threatening to prosecute such claim against them in separate litigation, they were entitled to become parties, and praying for a declaratory judgment as to whether they were liable to Lipps. The petitioners were admitted as parties complainant.

Thereafter, Lipps filed his answer and cross-bill, alleging that the Corporation and the hospitals unlawfully terminated their contract with him in order to obtain "cheaper agency service," or for some cause other than "breach of contract, neglect, inefficiency, or like conduct or characteristics" on his part, and thereby became liable to him for damages in the sum of $59,109.60, in addition to $1,169.21 for commissions earned prior to the termination of his contract, and $325.66 for expenses incurred thereafter. He denied liability to the appellants in any amount.

Voluminous testimony was taken and hundreds of exhibits were filed upon the trial.

On June 20, 1950, the trial court entered its decree, holding that all of the appellants were parties to Lipps' contract and bound thereby; that the contract was breached by the appellants; and that since the monthly collections averaged $9,851.63, 10% of which was $985.16, Lipps was entitled, according to the schedule in the contract, to sixty monthly payments of $985.16, that is, $59,109.60. It accordingly adjudged, ordered and decreed that Lipps "recover of the aforesaid original and peti-

tioning complainants the sum of $59,109.60 to be paid at the rate of $985.16 per month, beginning with a monthly payment of $985.16, November 1, 1947, and continuing thereafter on the first of each month until sixty (60) monthly payments of $985.16 have been made, together with interest on each monthly payment from the time it falls due until paid.'' It further ordered that ''execution may issue for all monthly payments now due, together with interest thereon, and that in the event the monthly payments that hereafter fall due are not promptly paid that execution may be issued thereon as soon as any default in any payment may occur.'' It held that Lipps was entitled to recover the aforementioned sums of $1,169.21 and $325.66. It further held that Lipps was entitled to reasonable compensation for his service in sending out cancellation notices to subscribers. It then referred the issues as to the amount of such compensation, and whether appellants were entitled to damages for the alleged delay of Lipps in sending out cancellation notices, to a special commissioner for report after hearing additional evidence.

Appellants contend the trial court erred in construing the contract involved—in holding that they breached it; in adjudging the Corporation and individual hospitals liable to Lipps for the sums mentioned; in authorizing execution to issue on its judgment before ascertaining the status of other claims and accounts between the parties; in decreeing the recovery of sums not yet due; in authorizing the issuance in the future of executions upon the non-payment of these sums; and in holding that Lipps was entitled to compensation for sending out notices cancelling the contracts for hospital service.

The principal questions, however, are whether the court erred in its construction of the Lipps' contract, and whether it erred in holding that he was entitled to a reasonable compensation for his work in sending out cancellation notices to policy holders.

At the outset, it must be noted that appellants' brief fails to contain ''A clear and concise statement of the facts,'' as required by Rule 5:12, section 1 (c) of this court. Sixty-six pages of their brief are taken up with a long statement of isolated facts interspersed with lengthy argument. Appellee's brief fails to comply with Rule 5:12, section 2 (c) in not making appropriate references to the pages of the record containing evidence. It has been necessary for us to summarize the pertinent and

controlling facts from lengthy pleadings and the voluminous testimony presented in the cause.

The testimony is conflicting, and, therefore, the conclusion of the chancellor on the facts is entitled to great weight. The decree is presumed to be correct in that respect, and if fairly supported by competent and credible evidence, it may not be disturbed. *Ashby* v. *Dumouchelle,* 185 Va. 724, 731, 40 S. E. (2d) 493; *County School Board* v. *Dowell,* 190 Va. 676, 682, 58 S. E. (2d) 38.

The hospitalization Plan here involved was originated in 1933 by six hospitals in the southwestern area of Virginia, and operated by an organization known as ''The Association of Southwestern Virginia Hospitals,'' hereinafter called the Association. The contract between the hospitals, dated September 23, 1933, gave to the individual hospitals the right to withdraw from the Plan on thirty-days notice, and further provided that the Plan could be terminated and the Association disbanded by two-thirds vote of the member hospitals.

The Association employed an agent on a commission basis to sell contracts for hospitalization service. This was a new type of business in that particular area, and the agent was unsuccessful in his efforts to promote the Plan. After writing a few contracts, he absconded with some funds of the Association. The Association was then carried on for some little time through the efforts of the individual doctors who operated or owned the hospitals.

In 1935, James C. Lipps, a school teacher, became interested in the prospects offered in a promotion of the Plan. He had been selling insurance as a side line, had done very well with it, and thought that he would like to see what he could do with selling contracts for hospital service. He got in touch with one of the leading doctors of the Association, and together they agreed upon a contract, under which Lipps became the administrative agent of the Association.

The theory of the Plan was that each subscriber would pay a monthly premium to the Association, which entitled a subscriber in need of hospitalization to enter the participating hospital of his choice. The agent collected the payments from subscribers and turned them into the treasury of the Association. Each hospital would bill the Association for services rendered subscribers, payment being made out of the premiums collected.

The rate of premium charged subscribers and the schedule of fees and charges for hospitalization, medical and surgical services were fixed by the hospitals and their associated doctors.

The contract provided that Lipps should receive $3 for each contract sold, to be collected from persons to whom he sold the service, and as additional compensation should be entitled to 20% (thereafter raised to 25%) of all the monthly payments collected by him or his agents from persons to whom the service had been sold. Lipps agreed not to promote any other similar organization, to maintain and keep an office, employ necessary sub-agents, furnish clerical help at his own expense, and to give the Association access to his accounts, books, and records. Other provisions related to the handling of the funds collected and settlement with the Association. Both parties agreed to cooperate with the view to attaining the best results in furtherance of the purpose of the agreement.

A copy of the form of contract to be sold subscribers was attached to and made a part of the agreement. It provided that any of the participating hospitals could withdraw from the Plan and also cancel their obligations to subscribers upon giving a required notice.

Lipps entered upon his duties energetically. The contracts with subscribers were liberal in the rates charged and the coverage afforded. He built up a large number of contracts, and it was necessary for him to employ sub-agents and clerks to carry on the business promotion. After three years' operation under his management, twelve additional hospitals were admitted to the Association. The increased number of hospitals, increase in the number of outstanding contracts and the labor required in administering the Plan brought about the organization of Southwest Virginia Hospitals, Inc., in 1938.

After the Corporation was chartered and received its license to operate, eighteen participating hospitals (including the present fifteen appellants and three others which subsequently withdrew) entered into a contract with it. This contract, dated November 29, 1938, specifically designated the Corporation "as the agent of the participating hospitals, and each of them, for the purpose of carrying into effect the program of group hospitalization herein provided for * * *, and to do any and all other things incident to its duties as in this agreement defined." It provided that the Corporation "shall employ a

managing director who * * * shall be charged with the duty of carrying on the operations of the Corporation under the Contract, hereto attached and made a part of this agreement as completely as if it were herein set forth at length.'' The Lipps' contract of January 1, 1935, with the Association was the ''Contract'' referred to.

By agreement of July 1, 1939, the Association transferred all of its interest in the Plan to the Corporation, expressly reciting that the agreement was ''subject to a certain contract entered into on the first day of January, 1935, with James C. Lipps, general agent, which said contract becomes a part of this purchase agreement the same as if it were incorporated herein.'' Lipps was continued as the sole managing director of the Corporation. The contract of November 29, 1938, provided that any participating hospital might withdraw on ninety days' notice, and that the Plan might be terminated by agreement of all of the hospitals and the Corporation on ninety days' notice from two-thirds of the hospitals. -

At the outset, the fees charged by the hospitals for services were much below those paid by non-subscriber patients, and they suffered more in comparison during the subsequent inflationary period. In some instances, costs of services, medical supplies and hospitalization tripled, and in others doubled. Lipps, several times, proposed an increase in the schedule of medical and surgical fees; but the doctors and hospitals, who alone had the right to fix the schedule, thought it unwise to do so. Some changes, however, were made in the form of coverage under the subscribers' contracts. One change, made in 1945 at Lipps' suggestion, required subscribers to pay the first $20 of each bill for service. While this did not increase the premium income of the Corporation, it reduced by $20 the amount of each bill submitted by the hospitals to the Corporation, leaving the latter with a greater amount of funds. The deductible form of contract did not produce, on the whole, a sufficient amount to satisfy the hospitals. They still claimed that they operated at a loss, although there is evidence to the contrary. The hospitals would not agree to require the outstanding non-deductible contract holders to subscribe to the deductible contract, if they cared to continue the service.

Figures illustrative of the service of Lipps show that the fifty-five policies outstanding on January 1, 1935, when he

began his duties, were increased to 3,619, covering nearly ten thousand persons, when cancellation notices were sent out on October 29, 1947. In 1934, under the management of a former agent, collections on the contracts amounted to $2,193.92; in 1935, under the management of Lipps to $6,067.61; in 1940 to $29,071; and in 1946 to $127,095.12. In the three months preceding the cancellation of all of the subscribers' contracts, collections for August were $10,133.03; for September $9,827.60; and for October $9,592.28, totaling $29,556.91, a monthly average of $9,851.63. Lipps had then built up the business to a point where his net income, after payment of his expenses, was around $9,000 per year.

The Corporation, at a meeting of its board of directors on February 6, 1946, passed a resolution extending a vote of thanks and appreciation to Lipps for his interest and good work in carrying on the affairs of the Corporation. Subsequently, on February 22, the president of the Corporation wrote a letter to Lipps, which ended with the following sentence: ''Again expressing to you my fullest approval of the manner in which you have conducted the affairs of our Hospital Association.'' There is not a single word of testimony in derogation of the performance of his services in selling contracts under the Plan.

In view of their lack of profitable operation, it appeared that the hospitals became disturbed by the amount of income earned by Lipps. In August, 1946, Lipps was told by the secretary-treasurer of the Corporation that he would have to get rid of one of his sub-agents because the agent was making too much money, and if he did not the Corporation was ''going to tear up'' the contract with him. From then on, pressure was put on him to reduce his commission from 25% to 15%. Several of the doctors representing the hospitals told Leonard Cole, a sub-agent of Lipps, that they considered the percentage too high and were going to make a change. Cole suggested that he might take over the business on a basis of 15%. In reply, he was advised that nothing could be done until a settlement was had with Lipps. Negotiations with Lipps for a reduction of his commission were fruitless.

The minutes of a meeting of the board of directors of April 9, 1947, contained the following: ''Dr. Botts moved that if Mr. Lipps could not operate at 15% *that his agreement with the Hospitals be terminated*, and a ninety days' notice be given the

State Corporation Commission of the disbandment of the Corporation. Mr. Hylton seconded the motion. The vote for the adoption of the motion was 8; none against.'' (Italics added.)

At a special meeting of the board of directors of the Corporation on July 16, 1947, a resolution was adopted calling for an agreement with the participating hospitals for termination of the contract of November 29, 1938, and the appointment of a committee to work out the necessary steps for winding up the business of the Corporation. It was further resolved that the expense of the Corporation in terminating the contract and in winding up its business should be shared equally by the hospitals. Pursuant to the above resolutions, the Corporation and the hospitals on the same date entered into an agreement terminating the contract of November 29, 1938. Upon the execution of that agreement, a special committee, appointed at the directors' meeting, on July 16th, wrote a letter to the State Corporation Commission, requesting the cancellation of its license to sell further contracts to the public. On August 15, 1947, the Commission ordered that the license be suspended, but that the operation of the Plan and rendition of the services under outstanding contracts be and remain in full force and effect until further order.

Conferences were held between Lipps and representatives of the appellants with reference to the means, method and expense of sending out cancellation notices to holders of outstanding contracts. On August 23, a committee representing the appellants notified Lipps, in writing, to give notice to subscribers that their contracts would be terminated at the expiration date of each contract, and enclosed a form of notice to be used. On September 3, Lipps wrote to the attorney for appellants asking for a signed statement from each hospital authorizing the proposed action, or else a certified copy of the minutes of the meeting of the board of directors of the Corporation on July 16, 1947. On October 6, 1947, after further conferences between the parties, a committee representing the hospitals confirmed, in writing, the notice of August 23, and added that Lipps' action in compliance therewith should be ''without prejudice'' to any rights he had under his contract of January 1, 1935.

Due to the failure of the parties to agree upon their respective rights, duties and liabilities, cancellation notices were not sent out by Lipps until October 29, 1947. Lipps advised the

appellants of his action, and that he had paid himself $10,857 for his services by withdrawing that amount from the Corporation's funds in bank. At a meeting of the executive committee of the Corporation, held on November 3, 1947, the authority of Lipps to sign the Corporation's checks was revoked, and his action in paying himself the compensation disapproved. This disagreement between the parties continued, and on November 20, 1947, the board of directors of the Corporation adopted a resolution reciting "that Mr. Lipps' actions amount to a resignation of his position as managing director of the Corporation and that such resignation be, and the same is, hereby accepted."

The action of the appellants consequently made it impossible for Lipps to carry out his contract. His services in their behalf ceased when he sent out notices of cancellation of subscribers' contracts on October 29, 1947. He subsequently refunded the $10,857, which he claimed as compensation, in accordance with a decree of the court.

On the same day, the Corporation entered into a contract with Leonard Cole, a sub-agent of Lipps, to service outstanding contracts to their termination dates for a commission of 10% upon collections made. Cole said that he agreed to the reduced commission since there was a large volume of business built up, but that he would not have taken the contract at the time Lipps first entered into it for less than a 25% commission, because of the cost of promoting the business and the low return in the beginning.

Cole thereafter became district manager of another company, not connected with appellants, selling hospitalization contracts. He notified subscribers to the Plan here involved that they might immediately "transfer" their contracts to the new company at any time prior to the expiration of their contracts. He said this seemed to be agreeable to the appellants, because contracts of his later employer allowed higher fees for surgical operations. It appears that he subsequently transferred the business, or a large portion thereof, to his new employer.

As we have seen, the trial court held Lipps entitled to compensation, but did not determine the amount because of the insufficiency of the evidence. That issue and the liability of Lipps, if any, to the Corporation remain undecided, and the determination of these questions may affect the ultimate liability of the parties to each other.

The disagreement between the parties as to their respective obligations and liabilities under Lipps' contract of January 1, 1935, brought on this controversy. A solution is dependent upon a proper interpretation of sections nine and ten of that contract. There is ample evidence, shown by the extracts from the several contracts hereinbefore mentioned and by oral and written testimony, that all of the appellants were parties to the contract. It was an integral part of all' the basic agreements embodying the Plan. The Corporation and the participating hospitals, both by word and deed, recognized that Lipps was their agent, and that they were parties to and bound by his contract.

Sections nine and ten of the contract of January 1, 1935, made a part of the contracts of November 29, 1938 and July 1, 1939, hereinbefore mentioned, read as follows:

"NINTH—This agreement may be terminated by either party hereto on thirty days' written notice to the other party. The parties of the first part shall have the further right to terminate this contract immediately for neglect, inefficiency, or like conduct or characteristics on the part of the party of the second part, but not solely for the reason that cheaper agency service can be obtained. In event of the termination of this contract, the right of the parties of the first part to continue to sell and furnish a similar form of service, on a similar plan, shall not be abridged or effected."

"TENTH—In the event that this contract is terminated by the parties of the first part for any cause except breach of contract, neglect, inefficiency or like conduct or characteristics on the part of the party of the second part, the party of the second part shall receive as remuneration for his efforts, in building business for the association, a percentage of the monthly collections that may subsequently be collected for a certain period of time on the contracts sold by him. This percentage shall be computed in amount and time according to the following schedule which shall be based upon his average monthly collections for the three months preceding such termination of contract. Schedule as follows:

| "Monthly collections | Party of the Second Part Shall Receive |
|---|---|
| $1,000 or over | 10% of collections on his contracts for 5 years. |
| $800 to $999 | 10% of collections on his contracts for 4 years. |

| | |
|---|---|
| $600 to $799 | 10% of collections on his contracts for 3 years. |
| $400 to $599 | 10% of collections on his contracts for 3 years. |
| Less than $400 | No benefits shall be paid.'' |

Appellants contend that since the hospitals from the outset of the Plan reserved the right to withdraw individually, to terminate the Plan, and to cancel subscribers' contracts, it was not contemplated that any liability to Lipps would exist after the cancellation of the subscribers' contracts; that they were not obligated to continue Lipps' contract because it was for an indefinite term and could be terminated at will, on notice, and lacked mutuality; and that the cancellations of the subscribers' contracts was not a termination of Lipps' contract within the meaning of section ten.

The first sentence of section nine gives either party the unrestricted right to terminate the contract on thirty days notice for any reason or no reason. The second sentence gives the Association (subsequently the Corporation) the right to terminate it immediately ''for neglect, inefficiency or. like conduct or characteristics on the part of'' Lipps, provided, however, that such termination shall be ''not solely for the reason that cheaper agency service can be obtained.'' The last sentence preserves the right of the doctors and the hospitals to continue the Plan. However, this section does not relieve the terminating party from any liability provided in section ten.

It is not practicable within reasonable limits to set out herein all of the evidence in connection with the controversy. It is sufficient to say that the testimony amply shows that Lipps, at all times, held himself in readiness to perform his obligations, and that his contract was breached by appellants in order to obtain ''cheaper agency service,'' and not for any ''breach of contract, neglect, or inefficiency on the part of Lipps.''

The language of section ten is ambiguous. It was drafted, we are told, by a doctor representing the Association and Lipps, laymen to the law. It must be construed in the light of the language employed, the subject matter thereof, and the surrounding facts and circumstances disclosed in the record in order to ascertain the intent of the parties. *Talbott* v. *Richmond, etc., R. Co.,* 31 Gratt. (72 Va.) 685; *Chesapeake, etc., Tel. Co.* v. *Wythe Mut. Tel. Co.,* 142 Va. 529, 129 S. E. 389.

Consideration of the occasion which gave rise to the contract, the expressed intention of the parties, and the object to be attained should be considered as well as the language of the instrument itself, and a construction adopted which will effectuate the real meaning and intent of the parties. *Southern Ry. Co.* v. *Franklin, etc., R. Co.,* 96 Va. 693, 32 S. E. 485, 44 L. R. A. 297.

In doing this the contract should be considered as a whole and its construction should be reasonable and just. 4 M. J., Contracts, pages 382 and 391.

Because of the ambiguity, both parties to the cause introduced oral evidence in explanation. In drawing up the agreement with Lipps, the contract which the Association had with its former agent was used as a basis. Section nine therein, the same as section nine in the new agreement, primarily provided for the protection of the Association. Lipps wanted some assurance or guaranty that if he were successful in his undertaking, the contract would not be terminated by his employers without his fault, and he be left without any benefit resulting from his fruitful labor. The testimony of Lipps and Dr. C. L. Harshbarger, a director of the Corporation and a repesentative of the hospitals, with whom his contract was negotiated, shows that section ten was designed and added to the contract in contemplation of their obligation due to Lipps. The words "not solely for the reason that cheaper agency service can be obtained," contained in section nine, emphasize a realization, appreciation and acceptance of the same principle.

It was thus recognized that if Lipps built up the business he was entitled to share in the benefit resulting from his efforts. Lipps said, and it is not contradicted, that they were consequently trying to settle on a definite amount to be paid him as liquidated damages in the event his contract was unfairly terminated. Attention was directed to section one of his contract which entitled him to compensation on all monthly payments collected by him or his agents from persons to whom the service "has been or shall be sold." It was desired, in the event of his discharge, to avoid any claim under that section. Therefore, section ten was written to fix his liquidated damages at a percentage on his average collection during the last three months of his service, leaving out of consideration collections subse-

quent to the termination of his agency, whether or not the plan was continued in operation.

The words "shall receive as remuneration for his efforts, in building business for the Association, * * *," show that it was contemplated that Lipps should be compensated for his loss of commissions. Ambiguity arises out of the phrase which follows, "a percentage of the monthly collections *that may be subsequently collected for a certain period of time on the contracts sold by him.*" (Italics added.) These words set out generally the plan of remuneration. Monthly collections were, of course, "subsequently collected for a certain period of time on contracts" sold by any one. Premiums were not required to be collected in advance. The next sentence specifically fixes a time limitation for the collections upon which the percentage is to be applied. The words, "This percentage" therein refers to the words "a percentage" in the foregoing sentence. The schedule fixes the amount of the percentage, and the time during which payments are to be made. The words "on the contracts sold by him" and "on his contracts" each have reference to "his average monthly collections for the three months preceding such termination of contract." The second sentence is the yardstick by which the remuneration is to be computed. The percentage to be used and the time of payment of the remuneration is specified in the schedule. Commissions which Lipps might have earned are not in question. The contract provides for the payment of a liquidated sum, that is, a fixed percentage on a specific amount readily ascertained.

In the situation in which the parties found themselves at the time of the negotiation of the contract, the success of the plan and Lipps' reward depended upon the sale of subscribers' contracts and the subsequent collection of the monthly premiums payable thereon, that is, upon, "the monthly collections that may subsequently be collected * * * on the contracts sold by (Lipps) him." The $3.00 fee payable to Lipps for each contract sold was in full remuneration for obtaining the sale. However, it was agreed that he was entitled to "additional compensation of 25 per cent of all monthly payments collected by him or his agents from the person to whom the service has been or shall be sold." This was a continuing right and benefit subject to an increase in value measured by the effect of Lipps' efforts in building up the business. In the event of his loss of this bene-

fit, it was intended to provide a measure for determining the value of his right in the benefit. The subject of discussion between the parties and the object of section ten was to give to Lipps a liquidated compensation in lieu of his right to receive a commission on the "monthly collections that may subsequently be collected", in the event of the breach of the contract by appellants. The last quoted phrase merely identified an element of the contract in the consideration of Lipps' right in the collections which followed the sale of contracts. It did not confine "collections that may be subsequently collected" to a period of time following the termination of the contract. It was not to be expected that Lipps would sell contracts after termination of his service. The sentence which follows makes this amply clear. It fixes the base for the measure of the compensation. Then follows the schedule which sets out the percentage and the time of payment of the ascertained damages.

Lipps testified that: "We fixed a definite amount to be paid over a definite time, realizing that the subsequent collections would never equal that amount, because under my contract no more would be sold to my benefit, and they would drop off gradually each month so that this money that was to be paid me under the fixed amount would have to come from somewhere else rather than subsequent collections. We realized that, at the time we wrote the contract."

He further reiterated the understanding that his damages were to be figured at 10 per cent of the average collections for the three months preceding the termination of his contract and would be payable according to the schedule.

There is no provision or requirement that the percentage to be paid Lipps should come *out of the collections* made after the termination of his contract. The collections, prior to his discharge, constituted the base for the application of the percentage. While it was contemplated in the beginning that the Plan was to be continued, there is no provision that it should be continued in order to entitle Lipps to liquidated damages. Consequently, the amount of his remuneration as liquidated damage was confined to a percentage of his average monthly collections during a period preceding the termination of his contract, rather than to possible but uncertain and indefinite collections thereafter. The schedule attached speaks of amount and time and not of conditions.

The fact that appellants had the right to terminate the contract at will, on notice, did not operate to relieve them of liability for its termination. Section ten was included to establish and measure that liability. Not only did the Corporation and the several hospitals agree among themselves to terminate Lipps' contract; they made it impossible for him to perform his duty. They had no right to do indirectly that which they could not properly do directly.

It is reasonably clear that section ten provides, in the event of the termination of the contract, except for designated causes, that Lipps should receive a remuneration, the reason for the remuneration and the amount of the remuneration. It is equally clear that it was terminated for the reason that "cheaper agency service" could be obtained.

We are, therefore, of opinion that the learned chancellor below correctly held "from the language employed in said contract, the subject matter thereof, and the surrounding facts and circumstances, as revealed by the record," that Lipps was entitled to recover "as liquidated damages an amount equal to ten percent of the average collections on his contracts for the last three months preceding the unlawful termination of his contract, in accordance with the schedule fixed therein." Ten percent of such average collections amounted to $985.16 per month.

Suffice it further to say that the evidence sustains the findings of the court below as to the judgments for $1169.21 and $325.66, and that Lipps was entitled to reasonable compensation for his services in sending out cancellation notices to policy holders.

Appellants urge in their brief, for the first time specifically, that Lipps' contract was for an indefinite term and lacked mutuality, and hence no liability was imposed on appellants for its termination.

This was not a part of the theory upon which the proceeding was conducted in the trial court. The enforcement of the provisions of the contract was not questioned. The Corporation in its bill prayed for a discovery of information in the possession of Lipps and for a settlement of its accounts with him. The hospitals asked for a declaratory judgment as to whether or not they were liable to Lipps in any amount.

The instrument under review was not merely a simple contract for hire, indefinite as to its duration. There were

definite provisions for its termination, and for the resulting effects of a termination. It was mutual in that each party had the right to terminate it. Each was free to accept or refuse performance. The consequences of termination were, however, an entirely different matter, and, not unnaturally, affected each of them differently. Upon its termination by either party, appellants reserved the right "to continue to sell and furnish a similar form of service, on a similar plan, * * *," and thus reap the continuing and future benefits from the established business. If appellants terminated it for other than the excepted causes they were obligated to compensate Lipps for the benefits resulting from his efforts, in a sum based on his accomplishment in building up the business. If it was terminated voluntarily by Lipps, or because of his delinquency, he lost all rights and benefits therein, present or future. The question here is not the right of termination, but the liabilities of the respective parties upon termination.

Appellants cite a large number of cases in support of their argument. The rules laid down in those cases are rules of construction applied to the particular contracts under consideration. The peculiar facts of this case are substantially different from those in any case cited. Precedents do not afford us much aid under the circumstances here, except as to general principles. Rules and principles must be considered in relation to the present situation.

The parties freely and willingly entered into the contract, designed to protect the rights of each of them, and were agreed as to the consequences attendant upon its unfair termination. Lipps faithfully performed his duties thereunder. He built up a business capable of yielding a substantial income to him, both for the present and the future. On the other hand, the failure of appellants to modify, as they alone had the right to do, the coverage and fees charged subscribers, left them without a satisfactory income. Appellants were desirous of reducing the cost of selling subscribers contracts, so desirous that when they found they could obtain the services of a managing director to continue the large business which Lipps had built up for a smaller percentage of commission, they took steps which made it impossible for Lipps to continue his services. It seems to us that it would be inequitable and unjust, under the circumstances

and conditions, for a court of equity not to hold them liable in accordance with their agreement.

Finally, it is said with respect to the decree, first, that the chancellor erred in awarding a judgment covering both amounts due and amounts not yet due; and, second, in awarding interest upon instalments not due and authorizing execution in the future for a liability not then due.

When the decree complained of was entered on June 20, 1950, only about half of the monthly instalments had fallen due. However, in response to the prayer of the hospital appellants for a declaratory judgment "as to whether or not they are liable to Lipps in any amount," the court decreed that Lipps "recover" of the appellants "the sum of $59,109.60 to be paid at the rate of $985.16 per month, beginning with the monthly payment of $985.16 November 1, 1947, and continuing thereafter on the first of each month until sixty monthly payments of $985.16 had been made."

The effect of the judgment as to the monthly future payments is merely to direct the payment of such instalments as they may mature under the terms of the contract, and is not, in fact, a judgment for the present recovery of such items.

There is a difference of opinion as to the correct measure of recovery for the breach of a contract to pay an indemnity periodically. The diversity seems to be based largely on the factual question whether the breach is entire or partial. See Annotation, "Remedy and measure of recovery where insurer breaches the contract to pay indemnity periodically," 81 A. L. R. 379 ff.

A majority of the courts hold that an unequivocal repudiation of the contract gives the injured party the right to treat the entire contract as broken, and to sue immediately for a total breach, 12 Am. Jur., Contracts, 966, 970, on the ground that the law frowns upon a multiplicity of suits where one action will suffice. *Federal Life Ins. Co.* v. *Rascoe* (C. C. A. 6th), 12 F. (2d) 693, (certiorari denied 273 U. S. 722, 47 S. Ct. 112, 71 L. ed. 859); *Milburn* v. *Royal Union Mut. Life Ins. Co.,* 209 Mo. App. 228, 234 S. W. 378; and *Indiana Life Endowment Co.* v. *Reed,* 54 Ind. App. 450, 103 N. E. 77.

Some courts have approved the form of a judgment determining the measure of liability for future instalments, but providing for the payment thereof pursuant to the terms of the

contract. *Colburn* v. *Clover Leaf Cas. Co.*, 206 Ill. App. 327; *Central Life Ins. Co.* v. *Roberts*, 165 Ky. 296, 176 S. W. 1139. See also, *Southern Travelers' Ass'n* v. *Boyd* (Tex. Civ. App.), 1 S. W. (2d) 446 (modified in 12 S. W. (2d) 183).

Here there was an actual breach coupled with an unequivocal repudiation of the terms of the contract. The breach was entire, putting an end to the contract except as it afforded a basis for an action for damages. The entire liability could be and was determined in one proceeding in accord with public policy.

In Virginia, we have followed the principle that a court of equity may render judgment for amounts due as a portion of an obligation payable in instalments, reserving the right to extend its decree to embrace instalments thereafter falling due.

In *Marshall* v. *Thompson*, 2 Munf. (16 Va.) 412, 413, a suit in equity for arrears of an annuity, we said:

"The court is of opiinion that * * * she should not have been limited by the decree of the court below to the annuities which had actually fallen due before the date, but that liberty ought to have been reserved to her thereby *to apply to the court from time to time, to extend its decree, so as to embrace all the annuities therafter falling due during her life.*" (Italics added.)

In *Buchanan* v. *Buchanan*, 174 Va. 255, 273, 6 S. E. (2d) 612, 619, we reaffirmed the above principle, saying:

"Not only may resort be had to a suit in equity for the collection of arrears of annuity, but there should be reserved liberty to apply to the chancellor for relief to cover payments thereafter falling due. Opinion by Judge Roane in case of *Marshall* v. *Thompson*, 2 Munf. (16 Va.) 412. This decision has never been adversely criticized in any of our subsequent opinions."

In *Isaacs* v. *Isaacs*, 117 Va. 730, 86 S. E. 105, L. R. A. 1916 B, 648 and *Eaton* v. *Davis*, 165 Va. 313, 182 S. E. 229, judgments were rendered for alimony payable in future instalments, but executions thereon were not mentioned.

The first ground of the objection to the judgment is directed more to form than substance. It has no merit. Its form does not prejudice the rights of the appellants.

The provision of the decree "that execution may issue * * * as soon as any default * * * may occur" with respect to the monthly instalment which may thereafter fall due is premature. Execution may be directed to be issued only for payment of amounts due or past due. It cannot be known whether default

will occur in the payment of future instalments. Whether or not a default does occur in the future may present a question for determination by the court. No method is provided by the decree, and none exists, so far as we know, to determine in advance such default. The question of default cannot well be satisfactorily determined by the officer issuing an execution. He must have judicial authority.

The court should have reserved leave to Lipps to apply to it from time to time, for relief, if necessary, to cover payments of instalments thereafter falling due.

For the reasons stated, we are of opinion that the cause be remanded to the circuit court, with direction that the decree be modified as indicaed above, having regard to the time of its modification, and for such other proceedings as may be necessary and proper for the determination of the undecided issues. In all other respects the decree is affirmed.

*Affirmed in part, modified in part, and remanded.*

BUCHANAN, J., dissenting.

The judgment of $59,109.60 against the appellant hospitals, which is affirmed by this decision, is based on a construction of the Lipps contract of January 1, 1935, which, in my judgment, is at variance with the plain language of that contract. What that contract means should be determined by what it says; not by what Lipps now says the understanding was.

The Lipps contract was made with an associated group of five hospitals. After Southwest Virginia Hospitals, Inc., was formed, the hospital group which contracted with Lipps, together with the additional hospitals which are parties to this litigation, entered into the agreement of November 29, 1938, with the corporation. The Lipps contract was attached to and made a part of that agreement, and Lipps was bound by its terms just as firmly as he would now bind these contracting hospitals by its terms.

That agreement of November 29, 1938, provided, in Article XI, Sec. 1 thereof, that "This contract may be terminated without notice by agreement in writing of all of the Participating Hospitals and the Corporation."

The hospitalization contracts which Lipps sold provided that they might be cancelled at any time by either the subscriber or

the hospital, upon the giving of thirty days' written notice of cancellation.

By written contract dated July 16, 1947, the corporation and all of the participating hospitals agreed to terminate the contract of November 29, 1938.

On August 23, 1947, a committee, duly appointed to act with the attorney for the corporation to wind up its business, wrote to Lipps, enclosing a form of notice which "in accordance with our understanding with you" he was to have printed or mimeographed and mailed to the individual subscribers, informing them that their contracts would be terminated at the termination date of each contract. This letter called his attention to the fact that "as you know," the Corporation Commission had entered an order on August 15, 1947, the effect of which was to prevent the corporation from issuing or renewing any hospitalization contracts under the plan.

Lipps, after some delay, mailed out these notices terminating all the outstanding subscriber contracts, and this is the service for which he now claims from the hospitals more than $10,000, in addition to the judgment granted him.

Lipps' contract with the hospitals, written by him, undertook to provide in paragraphs Ninth and Tenth thereof, quoted in the court's opinion, what his compensation would be in the event of such termination.

Paragraph Ninth provided that "This agreement may be terminated by either party hereto on thirty days' written notice to the other party."

It provided that the hospitals were to have the further right to terminate it for neglect, inefficiency, etc., "but not solely for the reason that cheaper agency service can be obtained."

The Tenth paragraph then provided that if the contract was terminated by the hospitals, *for any cause,* except neglect, inefficiency, etc., Lipps should receive "as remuneration for his efforts, in building business for the association," *a percentage* of the monthly collections "that may *subsequently* be collected for a certain period of time *on the contracts sold by him." "This percentage,"* that is, the percentage of the collections subsequently collected on the contracts sold by him, was to be calculated "in amount and time according to the following schedule," based upon "his average monthly collections for the three

months preceding such termination of contract.'' (Italics added).

Then follows the schedule. It seems to me perfectly plain. Reference to it in the court's opinion will show that if Lipps' monthly collections for the three months preceding the termination of the contract had been $1,000 or over, then Lipps was to have ''10% of collections *on his contracts* for 5 years;'' or he was to receive ''10% of collections'' *on his contracts* for shorter periods if his average collections for the three months prior to the termination had average amounts less than $1,000 a month.

The concluding sentence of paragraph Ninth is illuminating. It provided: ''In event of the termination of this contract, the right of the parties of the first part to continue to sell and furnish a smiliar form of service, on a similar plan, shall not be abridged or *effected*.'' That provision looked forward to the contingency that after the termination of the Lipps contract, the hospitals might continue to sell ''a similar form of service.'' In such event they would have the benefit of Lipps' work in building business; that is, selling hospital contracts. In that event, it was only fair, as the contract asserts, that Lipps should receive a percentage of the subsequent collections ''on the contracts sold by him.'' Can this mean anything other than what it says; i. e., that on collections made subsequent to the termination on contracts sold by Lipps previous to the termination, Lipps was to have 10%?

The average amount of the monthly collections for the three months preceding the termination of the contract is not the amount on which the 10% is to be calculated. The contract expressly says that the 10% is to be calculated on collections ''on his contracts'' subsequent to the termination. The amount of the average monthly collections for the three months prior to the termination simply controls the length of time for which the 10% is to run. If that average is $1,000 or more, the period is to be 5 years; if $800 to $999, the period is to be 4 years, and so on.

But instead of using the basis thus clearly provided by the contract, the court below, and now this court, has said that Lipps is to have for 5 years, or 60 months, 10% of the average monthly collections on the contracts sold by him for the three months *preceding* the termination, not on the collections made *subsequent* to the termination.

There is thus given to Lipps, every month for 5 years, in addition to the 25% already paid him under his contract, 10% of the average amount from all the contracts previously sold by him and on which collections were made during the three months preceding the termination of the contract, and amounting to the principal sum of $59,109.60, with interest, a sum which is apt to be not 10% but many times more than 100% of all collections made ''on his contracts'' subsequent to the termination.

The contract of November 29, 1938, was terminated because the hospitals were losing money. The 25% on collections paid to Lipps was doubtless an important cause of that result. To protect themselves against that eventuality, which would sooner or later, of course, put them out of business, they provided in their contract for a termination of it. Lipps' contract provided that if they did terminate it, *for any reason* other than his neglect, inefficiency, etc., they should pay him for certain periods of time 10% of collections made subsequent to the termination on contracts previously sold by him. He is certainly not entitled to more than that. He is now given a great deal more than that, contrary to and in spite of the terms of his own written contract.

MILLER, J., concurs in this dissent.