# Richmond

## Willie R. Ashby v. Napoleon Dumouchelle.

November 25, 1946.

Record No. 3104.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Harry L. Snead*, for the appellant.

*R. J. Francis* and *Charles Edgar Gilliam*, for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This is a suit brought by Napoleon Dumouchelle against Mrs. Willie R. Ashby for the specific performance of a written contract for the sale of land. The contract dated June 5, 1942, in consideration of a cash payment of $25, gave the plaintiff the exclusive right or option to purchase at any time within two years of its date, land described as follows:

"All that certain tract of land situate in Matoaca District, Chesterfield County, Virginia, which is bounded on the east by a strip of land owned by the State Highway Department; on the south by Fred Pilcher's property, on the west by Swift Creek and on the north by property now or formerly belonging to Marie Thompson and being the property

owned by Willie R. Ashby which lies between the strip of land owned by the State Highway Department and Swift Creek."

The full consideration for the land was stated as $1500, "payable upon reasonable terms to be agreed upon at the time of the exercise of the option to purchase," less a credit of $25, the sum paid for the option.

The following roughly sketched plat will show the land involved, and make clearer the contention of the parties:

The plaintiff claimed that the option embraced all of the land, shown on the above plat, lying west of the strip of land owned by the State Highway Department, north of the Pilcher line and south and east of Swift creek.

The defendant, on her part, contended that a mistake was made in the description of the property; that the description given in the contract was uncertain; and, in addition, that it would be inequitable to enforce the contract because of the inadequacy of price.

Only a short summary of the evidence is required.

Mrs. Ashby originally owned two parcels of land in Chesterfield county, Virginia, which she inherited from her late husband, C. A. Ashby. One of these parcels, comprising lots A, B, and C, as shown on the attached plat, fronted on the Richmond-Petersburg turnpike; the other parcel, comprising 7.42 acres, less .75 of an acre on the south, which had been conveyed by C. A. Ashby to Mrs. Susan Pilcher, wife of Fred Pilcher, in 1928, fronted on a strip of land 100 feet wide, separating this parcel from the first described parcel. This strip was formerly owned by a suburban electric railroad company, but had been abandoned for railway purposes and conveyed to the State Highway Department. However, it had never been improved, dedicated, or used for highway purposes.

Parcel C was conveyed by the defendant to the plaintiff in 1940. Parcel B had also been conveyed by her to Mary E. Thompson. Mrs. Ashby retained parcel A for her residence. Margaret J. Thompson owned the land to the north of the first tract adjoining parcel A. The triangular piece of land containing .75 of an acre in the southern end of the original tract of 7.42 acres had been conveyed to Mrs. Pilcher for the purpose of straightening her lines.

The plaintiff testified that a short time before June, 1942, he offered the defendant $500 for that portion of her land, west of the 100 foot strip, directly back of his land, lot C, and included between a continuation of the northerly and southerly lines of the property already owned by him; in

other words, lot 2 on the above plat. She refused the offer, but said she would think it over.

The plaintiff saw Mrs. Ashby again in about three weeks, at which time he said he offered to buy all of her land west of the 100 foot strip for $1500, provided she would give him two years in which to raise the money. She told him she would think it over. He told her to consult her brother, and let him know. She agreed. Five or six weeks later, she told him she was willing to sell the entire parcel for $1500, and instructed him to have an optional contract drawn up. The plaintiff had his attorney prepare the contract, and left it for execution before a notary public, after she had read and examined it. On June 6, 1942, in the absence of the plaintiff, Mrs. Ashby signed, sealed, and acknowledged the contract. Upon its delivery to him, the plaintiff paid her $25. He then recorded the contract in the clerk's office of Chesterfield county.

In September of that year, the plaintiff informed Mrs. Ashby that he was going to take up the option soon. She told him that she had decided not to sell.

The next January, he went to see Mrs. Ashby, carried her $1475, and told her he was ready to take a deed for all of the property west of the 100 foot strip. She then informed him that she would only convey to him the land shown as lot two. She said, "I have decided not to sell. * * * I am not going to sell." When her attention was called to the description of the land in the written contract, she said she was offered more money for the whole parcel and that she would not convey it to the plaintiff at the price named in the contract.

Subsequently the plaintiff had his attorney prepare a deed covering the property which he claimed was embraced in the contract. He again offered her the named purchase price if she would duly execute and deliver the deed to him. She refused. Further unavailing efforts were made to reach a settlement of the matter, both by plaintiff and his counsel.

Two experienced real estate dealers, familiar with local

values, after an inspection of the land, testified that $1500 was a fair price for the property claimed by the plaintiff.

J. G. Thompson, who acquired lot B from his deceased wife, Mary E. Thompson, agreed with the above valuation. He further said that his wife was never known as "Marie," but that Margaret J. Thompson was sometimes known as "Marie Thompson."

Mrs. Ashby testified that in her negotiations with the plaintiff, she agreed to sell him only the parcel shown on lot 2 on the attached plat, that being the land to the rear of the plaintiff's lot, fronting on the turnpike, and embraced within an extension of the northern and southern boundary lines of the lot already owned by him. She said she never had any idea of contracting to sell the entire tract west of the 100 foot strip of land because it was worth more than $1500, and that she signed the contract without reading it, because of her confidence in the plaintiff by reason of their former friendly relations. She further testified that she thought that the plaintiff claimed land that included her home place, lot A, a contention at no time advanced by the plaintiff. She denied that the plaintiff ever made an offer of $500 for a portion of the tract and later increased the offer to $1500 for the whole tract. She also said that the plaintiff and his attorney undertook to intimidate her into signing a deed. Subsequently she admitted that this was not true. She made some further statements which appear inaccurate and exaggerated. Finally, she undertook to escape performance on the ground that the description of the property intended to be sold was uncertain and indefinite.

Fred Pilcher, a witness for the defendant, who lived in the neighborhood, thought the entire tract embracing parcels 1, 2, and 3 had a market value of approximately $2500 or $3000, and that the lot shown as number 2 was worth between $1800 and $2000. He bases his valuation, however, upon speculative and imaginative features.

J. C. Kellman, a brother of Mrs. Ashby, testified principally concerning private conversations between himself

and his sister as to what the verbal understanding was between the plaintiff and the defendant before the contract was signed. He was, however, not present at any conversation between his sister and the plaintiff. While he said his sister consulted him frequently, it appeared from his own evidence that she rarely followed his advice. His testimony was purely hearsay.

It is unnecessary here to enter into an extensive discussion of the equitable principles governing specific performance. There are no new or novel principles involved.

Fraud is neither alleged nor proved. The mistake averred is only a question of fact. The correct decision of the case depends upon the determination of that fact. The only equitable principle involved is that which is applicable where there is reviewed the finding of the chancellor upon conflicting evidence. The burden of showing error is on the appellant.

All of the evidence was taken by depositions and is certified to us. It was, as might be supposed, in view of the separate contentions of the parties, conflicting and contradictory. The chancellor held, in a written opinion, that, in the light of the language of the contract itself, and from the facts and circumstances disclosed in the record, the plaintiff was entitled to receive a deed for the land described in the option, that is, all the property owned by the defendant between the strip of land owned by the State Highway Department and Swift Creek, as shown on the above plat, and entered a decree that the defendant convey to the plaintiff that land upon payment of the balance of the purchase price, less any earned taxes properly chargeable against the property.

The case comes to us on the ground that the decree is contrary to the evidence. Under the general rule in Virginia, it cannot be reversed unless it appears from the evidence that it is plainly wrong or without evidence to support it. While a decree based upon depositions is not as strong and conclusive as one based on evidence heard *ore tenus*, it is presumptively correct, and cannot be dis-

turbed if it is reasonably supported or sustained by substantial, competent, and credible evidence. In other words, the evidence must be clearly against the findings in order to justify a reversal. *Crump* v. *Bronson*, 168 Va. 527, 191 S. E. 663; *Harris* v. *Citizens Bank, etc., Co.*, 172 Va. 111, 200 S. E. 652; 1 Digest of Virginia and West Virginia Reports (Michie), Appeal and Error, section 322; 2 Virginia and West Virginia Digest (West), Appeal and Error, section 934; 3 Am. Jur., Appeal and Error, sections 900, *et seq.*; 5 C. J. S., Appeal and Error, sections 1656, *et seq.*

The written option gives a general description of the land agreed to be sold. It is "the property owned by Willie R. Ashby which lies between the strip of land owned by the State Highway Department and Swift Creek." It is described in bulk, not in acreage or by measurement. The defendant owned but one parcel answering that description. It has never been partitioned or subdivided. It has been one continuous tract since it was acquired by her.

Of the four boundaries named in the contract, three are definite and certain. The fourth is more in accord with the general description than that suggested by Mrs. Ashby.

The stated boundaries adequately identify land "which lies between the strip of land owned by the State Highway Department and Swift Creek," and make certain the particular land embraced in the general description. They do not describe lot number two, a portion of the tract. Lot number two is bounded on both the north and the south by other land of the defendant.

The eastern boundary of the land is clearly set out,— "on the East by a strip of land owned by the State Highway Department." No more accurate description of the whole property could be given. The same may be said of the western boundary. Swift creek bounds the whole parcel on the west.

The southern boundary is not indefinite. The evidence establishes the fact that the adjoining property on the south was commonly known as that of Fred Pilcher. Every witness knew that Fred Pilcher was the husband of Susan

Pilcher, the title holder of that land, and that he lived with his wife thereon. Even Mrs. Ashby testified that she discussed with Fred Pilcher a sale of a portion of the property here involved for the purpose of making "his line" on the north perpendicular to the turnpike.

As to the northern boundary, it is shown by undisputed evidence that within 100 feet of the northern end of the entire tract there is a strip of land formerly owned by Margaret J. Thompson, who was sometimes known as "Marie Thompson."

The defendant had ample time to read her contract before signing it. The plaintiff advised her to do so and further suggested she consult her brother. There was no confidential relationship between the parties. There were no especial circumstances or fraud to excuse her failure to read it. It was her duty to read it. After it was signed, the plaintiff had a right to rely on it. Under such circumstances, she cannot rely on her inexcusable negligence to defeat the terms of the written agreement. 12 Am. Jur., Contracts, section 137; *Lucketts* v. *Lucketts*, 10 Leigh (37 Va.) 50.

The clear preponderance of the evidence supports the conclusion that there was no uncertainty in the description of the property embraced in the option; that there was no mistake of the parties as to the land intended to be sold; and that the enforcement of the contract entails no hardship upon any one.

For the foregoing reasons, we are of opinion that no error has been shown in the decree complained of, and the same is accordingly affirmed.

*Affirmed.*