# Richmond

MARION MATRAVERS NASH v. CAMILLUS A. NASH, III.

May 4, 1959.

Record No. 4913.

Present, All the Justices.

*C. Dodson Morrisette*, for the appellant.

*John F. Rixey* (*Rixey & Rixey*, on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

This appeal resulted from the entry of a decree awarding Camillus A. Nash, III, appellee, a divorce *a mensa et thoro* from Marion Matravers Nash, appellant, and denying appellant separate maintenance.

In his bill of complaint, filed July 16, 1957, Nash alleged that his wife deserted him on June 10, 1957. He prayed for a divorce *a mensa et thoro* and for joint custody and control of their daughter,

also named Marion Matravers Nash, who was then nine years of age. On July 24, 1957, Mrs. Nash filed her answer which was treated as a cross-bill. She denied the charge of desertion and asked that no divorce be granted her husband. She did not request that a divorce be awarded her, but did pray for separate maintenance, custody of their daughter, Marion, as well as an allowance for support and maintenance of the child.

On petition of appellant the court, by decree of August 2, 1957, directed that appellee pay appellant $60 per week as alimony *pendente lite* and support money for the child whose custody by agreement remained with appellant. He had been paying $50 per week without a court order. The cause was referred to Delamater Davis, one of the court's commissioners in chancery, who was directed to take evidence and report his findings to the court. In his report he recommended that Nash be awarded a divorce *a mensa et thoro;* that Mrs. Nash be denied alimony; that the litigants attempt to agree on an amount which should be contributed by Nash for the support and maintenance of their daughter Marion, and that counsel for Mrs. Nash be awarded $250 for services rendered. Appellant filed exceptions to the commissioner's report and argument was heard thereon. By decree of January 10, 1958, appellee was awarded a divorce *a mensa et thoro* on the grounds of desertion; appellant was denied alimony or separate maintenance; custody of their infant child, Marion, was awarded to appellant with reasonable rights of visitation reserved to appellee who was required to pay $100 per month to appellant for the child's support and maintenance, and an allowance of $400 to appellant's counsel for services rendered was ordered paid by appellee. The correctness of this decree is here challenged.

The litigants were married on May 14, 1946 in Redwood City, California. It was the second marriage for Nash. His first culminated in a divorce and he was awarded custody of Diana Nash, a child born of that union. Mrs. Nash had been married twice before. Her first husband died soon after their marriage and the second marriage resulted in a divorce. She had no children by her former marriages. Mrs. Nash was acquainted with Diana for two years before her marriage to Nash.

The Nashes moved to Virginia and resided the major portion of their time at 1439 Graydon Avenue in Norfolk where they lived on June 10, 1957, the date it is alleged Mrs. Nash deserted her hus-

band. Diana Nash was four years of age at the time of her father's marriage to appellant. She lived with her father and step-mother until they separated and since then she has resided with her father. The other daughter, Marion, also lived with her parents.

The record shows that the relationship which existed over a long period of time between Mrs. Nash and Diana was far from being a desirable one. There is evidence that Diana was a rather difficult child who needed discipline. On the other hand there is evidence that Mrs. Nash cursed, belittled, criticized and compared Diana unfavorably with her own child, Marion. This state of affairs contributed to the gradual breakdown of the marital relationship between Mrs. Nash and her husband, which unquestionably is now beyond repair. According to Mrs. Nash, she failed to get cooperation from Nash in disciplining Diana. She wanted Diana treated by a physician in regard to her behavior, but Nash did not think it was necessary.

It was customary to send Diana to a camp in the summers, but in 1956 she did not attend as she had enrolled in Fairfax Hall for the fall term. Mrs. Nash stated that during that summer she had the most difficult time with Diana who was then fifteen years old. Conditions at the home were such that at times communications between Nash and his wife were accomplished by writing notes and leaving them on various pieces of furniture.

When Diana returned home for the 1956 Christmas holidays Mrs. Nash and her daughter, Marion, spent most of the nights at the home of appellant's father which was about two blocks from their residence. She had planned to be away with Marion on Christmas Eve, but at Nash's insistence that the two children be together on Christmas morning she stayed at the home that night. He, however, interposed no objection to her spending other nights at her father's residence. Mrs. Nash and Marion returned home after Diana's holiday had terminated.

In April 1957, Mrs. Nash wrote The American Institute of Family Relations, Los Angeles, California, requesting the name of the nearest local marriage counselor. She was given the name of a person residing in Newport News. She testified that she discussed the matter with her husband and requested him to accompany her for an interview in order to strengthen their marriage relationship. Nash denied that she discussed it with him. He said the first he had heard of such a proposition was when she presented him with a written separation agreement containing reference thereto.

In response to a note Mrs. Nash left him at the home in the spring of 1957 in which she listed certain items of indebtedness she had incurred, he answered on the back thereof complaining that he had told her "time and again" not to charge groceries, and that he gave her more than enough to pay cash. He also complained that she had kept him broke and had spent money for cameras, excessive clothing etc., when the money was needed for painting and repairs to the house and income tax in the amount of $517.50 due May 1, 1957. He criticized the untidy manner in which the house was kept. Among other things stated in the reply note was: "I wish you would move over to your father's home for good."

Diana arrived home from school to spend the summer on June 9, 1957. The next day Mrs. Nash and Marion moved back to her father's home where they have since resided. Among the articles moved from 1439 Graydon Avenue when she left were clothing and personal effects, a piano, the best china, flat silver, silver candlesticks, sugar and cream set, a mixmaster, an electric frying pan, other cooking utensils, an electric waxing machine, a washing machine, luggage, curtains, linens and food items.

"Desertion is a breach of matrimonial duty, and is composed first, of the actual breaking off of the matrimonial cohabitation, and secondly, an intent to desert in the mind of the offender. Both must combine to make the desertion complete. * * *" *Bailey* v. *Bailey*, 62 Va. (21 Gratt.) 43, 47, *Miller* v. *Miller*, 196 Va. 698, 700, 85 S. E. 2d 221.

It is clear that Mrs. Nash broke off matrimonial cohabitation on June 10, 1957. The principal issue is the intent of the offender at the time of separation.

Appellant contends there was no desertion on her part because she never had the intent to desert and because she moved from the home with her husband's consent. If the separation was by mutual consent there can be no wilful desertion. *Walker* v. *Walker*, 120 Va. 410, 412, 91 S. E. 180.

She testified that her husband frequently suggested that she move to her father's home. Marion said that on an occasion before June, 1957 when she was in the next room supposed to be asleep, she heard her father request her mother to move to the home of appellant's father along with her (Marion). Mrs. Nash stated that she had a clear understanding with her husband that she and Marion would move to her father's home when Diana returned from school.

When asked "For how long?" her response was: "Well, that was in—as I say, this was for a breathing spell, for the duration of time it would take us to get ourselves together, and in my opinion to see a marriage counselor and get ourselves straight and squared away on a basis for a sound marriage." But her testimony on cross-examination casts doubt that a clear understanding existed.

Mrs. Nash further testified that pursuant to discussions they had concerning the propriety of her leaving when Diana arrived from school, she prepared a written agreement about a week prior to June 10, 1957 containing the terms upon which the separation would be based. The instrument provided that Nash would pay to his wife one-third of his monthly income and an additional $100 monthly for Marion's support. She stated he objected to a provision in it whereby Marion could not be with Diana unless appellant was present. She said that he also objected to a provision whereby she and Nash would consult an accredited marriage counselor. When asked whether he agreed to the remaining provisions in the proposed agreement, she responded: "He didn't commit himself. He just said well, he was vague on the whole thing."

The agreement also included the following paragraph:

"Camillus and Marion Nash agree to sell their house, located at 1439 Graydon Place, Norfolk, Virginia and to divide the proceeds equally. The house is the equal property of Camillus and Marion. Household furnishing will be divided to the mutual agreement of Marion and Mill [Camillus]."

Subsequent to her leaving, the litigants had two or three conferences at Nash's home concerning their domestic problems. She stated they had sexual intercourse on these occasions. Nash denied that they had sexual intercourse. The last conference was on July 11, 1957. Not having reached an agreement, it was decided to discuss the matter with their attorneys. At one of these meetings Mrs. Nash presented another draft of a separation agreement which follows:

"For the purpose of securing a 'breathing spell' from our problems and for all of us to secure a better perspective of the whole picture.

"During this period of time Mill will have custody of his daughter, Diana Allen Nash.

"Marion Matravers Nash, daughter of Camillus and Marion Nash, will be in the custody of her mother, Marion M. Nash.

"Marion will be responsible for all her personal expenses such as groceries and clothing. Mill will pay a monthly remittance to

Marion of $300.00 or one third his monthly income, whichever is greater. He will take care of Marion Jr.'s expenses for piano lessons, swimming lessons etc. clothing and expenses of education. He will be responsible for all tax and insurance bills and Country Club dues.

"Household furnishings will be divided to the mutual agreement of Mill and Marion. The house, which is the equal property of Mill and Marion, will be occupied by Mill.

"The Norfolk Yacht and Country Club membership will be retained by Marion and Diana will be welcome to use its facilities as her daughter. Mill will be responsible for her expenses there.

"This separation is mutually agreed to by both of us and will expire when we both mutually agree to resume living together as man and wife and the separation is not to be considered as a desertion by either of us of the other, but is for the purpose of trying to preserve the marriage.

"As soon as this is signed by both Mill and Marion, Marion will have all her personal charge accounts transferred to her present address and will be responsible for all charges made on them thereafter for the period of the separation."

It is significant to note that both agreements, which were never executed, were prepared by Mrs. Nash without advice of counsel or assistance from anyone and admittedly showed her mental attitude and intent before and after June 10, 1957, the date of separation. She did have available for reference as to form a copy of a separation agreement not involved in this marriage.

On July 8, 1957 appellant wrote appellee the following letter:

"Marion and I can stay over at Dad's for the balance of the summer but I'm afraid it won't be practical on a long term basis as she needs to practice piano and to play with her friends while Dad likes to sleep all day. He is most pleasant about it but I know it's hard on him to try to sleep when there's noise.

"We've been there about 4 weeks now—sorry we didn't oblige you by going sooner but I'd hoped things would work out harmoniously in our marriage.

"Since you will not need much room in Sept. when D. D. [Diana] goes back to school it seems more practical for 'Marion, Inc.' to use the Graydon house and for you to get yourself the little apartment you had planned on. Let's get our ducks in a row as I'm to see my lawyer in a few days. Am trying to get myself organized first."

Nash denied that there was mutual consent to separate or that

there was a clear understanding between them about separation. He testified she did not leave on June 10, 1957 at his request; that he had an idea that she might move because she had removed some articles from the home and had prepared a separation agreement, but did not know she was leaving on that day, and that after leaving she did not assist in any manner in the operation of the home. He stated: "I have never urged or insisted that she leave. We—it hasn't been a happy marriage. We haven't gotten along well at all; and at times I have said 'Well, if you are not happy here, why don't you go over and live with your father?' In turn, she has suggested that I move in with my father in his apartment." He related that only once did he lay his hands on his wife in a violent way. He said during an argument his wife called Diana a "little bitch" and he became infuriated and pushed her down on her seat as she attempted to arise. He was asked on cross-examination if he did not consent to his wife and child (Marion) spending Christmas holidays with her father, and he replied: "I wasn't consulted. I didn't object." He admitted that it was more pleasant during her absence. In response to another question relating to whether he consented that they stay with appellant's father, he said: "I don't see how you can consent to something unless you are consulted. If they just walk out, I am not consenting or I am not objecting."

Nash stated that his marital troubles were not only due to the situation surrounding Diana, but among other things his wife's lack of interest in making a home, such as keeping it clean, preparing meals etc. He admitted he had stayed away from home on many occasions when it was not necessary because it was more pleasant. He said it "wasn't pleasant at all at home." Nash was asked what the situation would be if she had not left him on June 10, 1957, and he responded: "As far as I am concerned, she would still be living there and I would, too." He was asked on cross-examination: "Mr. Nash, didn't you exercise any authority in your household at all regarding the control and custody of Diana?" His reply was: "I tried but I was usually overruled and these rages would come on. I tried as best I knew how." He admitted that he had not loved his wife for sometime prior to June 10, 1957. He said he could not pin point the date, but "it grew less and less as time went on."

Diana testified that she arrived home from school on June 9, 1957; that the next morning while her father was at work Mrs. Nash told her that she was going to stay at her father's home because "we

didn't get along"; that Mrs. Nash and Marion departed that morning and have not spent the night there since, but Marion had taken meals at the home; that the operation of the household has been conducted by her father; that she and her step-mother did not get along together, and that she failed a majority of her subjects at Fairfax Hall.

William Herbert Nash, appellee's father, stated that he knew of no cause or provocation his son gave Mrs. Nash for leaving him; that appellee had been a good husband and a good provider for the family, and that he knew his son and daughter-in-law were not happily married. He was asked on cross-examination:

"Q. Isn't it true that she has tried and made suggestions whereby that what might be done on those suggestions would tend to preserve this marriage rather than destroy it?

"A. I don't think so. I think her entire line of thought had been one of criticisms and belittling and jealousy. That is my considered judgment.

"Q. Belittling whom and jealous of whom?

"A. Jealous of the daughter's affection for her father."

On re-direct examination there were the following question and answer:

"Q. Now, Mr. Morrisette has brought out some occasion of a year and a half ago when Mrs. Nash went into a rage at little Diana. Would you tell the Commissioner, please, the circumstances surrounding that occasion?

"A. Yes, sir. I remember it very vividly. I was around there one night and this little girl, sweet little girl, was on the floor playing; and her hands extended; and Diana, in her stocking feet, in moving around or playing or something, stepped on the little girl's fingers. And the little girl very—little Marion, very understandably, cried. Mill's wife, her first words were 'You damned little bitch.' And then from that point on, upbraided her for I should say another minute or two. And I was shocked. I knew if I said anything that I would say too much and that, after all, I was the father-in-law and the less said about it the better. So in a very short while I got up and went home."

He said that he thought Diana was the type of child that required discipline. In regard to the care and treatment Diana received from Mrs. Nash, his observation was:

"I think it has been one of almost constant—I don't know the word to use but belittling, criticizing, comparisons being made, until

it has produced a great inferiority complex in Diana, to the point at times I don't think she knows whether she is going or coming."

Virginia Nash, appellee's step-mother, had cared for Diana on occasions. She testified from her observations of the relationship between Mrs. Nash and Diana, she considered Diana was "a very badly neglected child." She also testified that Mrs. Nash had told her that she would never spend another night under the same roof with Diana; that Mrs. Nash had mentioned to her several times about divorcing appellee, and that she was going to take her child (Marion) and leave. She further stated that she had often heard Mrs. Nash say in the presence of the children that Marion possessed superior intelligence and Diana had subnormal intelligence. She admitted there were times when she had to exercise considerable discipline over Diana.

In *Miller* v. *Miller, supra,* Dr. Miller instituted a suit for a divorce *a mensa et thoro* on the ground of desertion. The lower court denied the prayer for a divorce on the ground that the evidence showed the separation was by mutual consent. We reversed the judgment and awarded Dr. Miller a divorce as prayed for. There we said at page 700: "* * * It is true, as the trial court observed, that Dr. Miller voiced no objection to his wife's departure at the time she left, but it was her conduct and purpose and not his state of mind that determined whether there was desertion. He was not required either then or thereafter to make an offer of reconciliation if she in fact deserted him. Code § 20-102"

There we also said at page 701: "* * * Desertion in the case in judgment is shown by direct proof of the act of leaving and of the intention accompanying the act. That being true, it is not essential that the evidence show the reason for the desertion. It may be without reason, as the evidence shows was the case here, and still be desertion."

As has been said the evidence was adduced before a commissioner in chancery and not heard *ore tenus* by the chancellor. That being true, the decree of the trial court, while presumed to be correct, is not given the same weight as a jury verdict. *Hoffecker* v. *Hoffecker,* 200 Va. 119, 124, 104 S. E. 2d 771.

In *Klingstein* v. *Eagle,* 193 Va. 350, 353, 68 S. E. 2d 547, it is stated:

"* * * On the testimony in deposition form, the decree is presumed to be correct and should not be disturbed for lack of proof if the

controlling factual conclusions reached are sustained by a fair preponderance of the evidence. *Ashby* v. *Dumouchelle*, 185 Va. 724, 40 S. E. 2d 493."

In the case at bar the record discloses that the findings of the commissioner and the conclusions of the chancellor that appellant did wilfully, voluntarily and without justification desert appellee when she left the home on June 10, 1957 and that such desertion was not by mutual consent are sustained by a fair preponderance of the evidence. We find no reversible error in the proceedings. A fee of $200 is allowed counsel for appellant for prosecuting this appeal.

The decree appealed from is

*Affirmed.*