CARRIERS INSURANCE EXCHANGE
and
O'Boyle Tank Lines, Incorporated,
Plaintiffs,

v.

TRUCK INSURANCE EXCHANGE
and
Maybelle Transport Company,
Defendants.

Civ. A. No. 505.

United States District Court
W. D. Virginia,
Danville Division.

March 5, 1962.

Meade, Tate & Meade, Danville, Va., for plaintiffs.

Sanford & Clement, Danville, Va., for defendants.

DALTON, Chief Judge.

This is a declaratory judgment action between two transport companies and their respective insurers to determine the ultimate liability for damages arising out of an explosion and fire on July 10, 1961, at Bassett Forks, Virginia. Both parties have moved for summary judgment and the cause is now before this Court for determination on the depositions filed herein, oral argument of counsel, and trial and pre-trial briefs submitted by counsel.

Both parties agree that the explosion and the resultant injuries and damages were caused by the negligence of the driver of the tractor and trailer unit, John W. Pearman, in leaving the unit unattended, and in failing to exercise proper care while gasoline was being pumped out of the tank trailer and into an upright out-of-ground storage tank by means of a portable pump. They likewise agree that, as to third parties, they are jointly and severally liable for the injuries and damages done to these third persons.

The issue for determination in this cause is who should be ultimately responsible for these damages—O'Boyle's insurer, Carriers Insurance Exchange, or Maybelle's insurer, Truck Insurance Exchange?

The parties also are in agreement upon the basic facts leading up to the explosion and fire.

The defendant, Maybelle Transport Company, is a North Carolina company transporting petroleum products in tank trailers in intrastate commerce in North Carolina, but not possessing the necessary authority from the Interstate Commerce Commission to transport petroleum products in *interstate* commerce although having permission to haul other products in interstate commerce. The plaintiff, O'Boyle Tank Lines, Incorporated, is a Virginia trucking company similar to Maybelle, but one which is authorized by the Interstate Commerce Commission to transport petroleum products in *interstate* commerce.

Maybelle had as a customer, Savings Oil Company of Tupelo, Mississippi, which operated H and D Oil Company, a Virginia corporation, with storage tanks and pumps on the premises of Hurd's Super Market, Bassett Forks, Virginia. Whenever Maybelle had an order to transport gasoline from the pipeline terminal at Friendship, North Carolina, to H and D Oil Company at Bassett Forks, it leased one of its tanker units to O'Boyle and the delivery was completed under O'Boyle's license. Maybelle's equipment and driver made the delivery, and O'Boyle received ten percent (10%) of the revenue for permitting Maybelle to use their franchise license— O'Boyle collecting the full charges and then making distribution to Maybelle.

Prior to January 31, 1961, this agreement between Maybelle and O'Boyle had always been only an oral agreement or lease. About that time a supervisor of the Interstate Commerce Commission informed both parties that the oral lease arrangement would no longer be acceptable by the I.C.C. As a result thereof, on January 31, 1961, Merritt of O'Boyle and Greer of Maybelle met and signed a lease.

This first one-trip lease required the lessor, Maybelle, to provide public liability insurance. About twenty later one-trip leases were executed by the two companies, the last one being the lease of July 10, 1961, the date of the explosion. All of these twenty subsequent leases required that the lessee, O'Boyle, must provide public liability insurance. That is to say, of the twenty-one written leases executed by the parties, O'Boyle was to provide public liability insurance under all except the first lease, including the lease dated July 10, 1961, under which the petroleum was being transported on the day of the accident.

Maybelle's counsel further contends that the lessee (O'Boyle) is bound under the I.C.C. regulations, Ex parte Order No. MC–43, dated November 23, 1956, Sec. 207.4, paragraph (4):

"(4) *Exclusive possession and responsibility.* Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement, * * *"

O'Boyle alleges that lease #1 was the applicable lease, that the subsequent change in liability coverage was made without their knowledge or consent, and O'Boyle has asked that the lease of July 10, 1961, be reformed to meet the terms of lease #1. Maybelle, on the other hand, alleges that the lease of July 10, 1961, being a solemn written agreement duly signed by authorized agents of the respective parties, is the lease controlling the liabilities growing out of the explosion.

The facts disclose that neither of the leases contained provisions relating to public liability which represented the true intentions of the parties. At no time did the parties discuss the terms of the lease in reference to imposing specific obligations as to liability in-

surance. The only discussion held between them about the contents of the lease concerned the division of the revenue. None of the leases were read by the parties before they were signed, and both companies apparently were chiefly interested in obtaining a written lease to satisfy the I.C.C. As R. H. Greer, Vice-President of Maybelle, testified:

"As far as knowing what was in the lease it wouldn't have made a bit of difference because we didn't discuss it, didn't read it, just signed it because we were purely interested in getting a lease." (P. 56, Deposition, Filed Jan. 3, 1962)

Mr. Greer further testified that the lease #1, signed on January 31, 1961, was one of a form which had been used previously with another company, Sugar Transport. He stated that on that day, or the next, February 1, 1961, he instructed his secretary to make up two or three hundred form leases, this time copying a form that Maybelle and O'Boyle had used previously to haul corn syrup from Baltimore to North Carolina; and that he had no intention of changing any of the terms of their agreement when he ordered these form leases prepared.

■ It is an unusual business practice for two companies to enter into an agreement without establishing the terms of liabilities, but that is what obviously happened in this case. It is clear that the parties did not have in mind or intend to contract on the public liability feature. Ordinarily the parties to a written agreement are bound by the contents of a written contract or lease which they have had an opportunity to read, and they may not escape the liabilities which it embraces by claiming ignorance of its contents. Ashby v. Dumouchelle, 185 Va. 724, 40 S.E.2d 493. However, there are instances where relief can be granted from provisions not in mind and not agreed upon by the parties. See Maryland Casualty Company v. Morris Oil Corporation, 233 F.2d 291 (4th Cir. 1956) and other cases cited therein.

■ It would seem fair and reasonable to say, therefore, that the liability provision of the lease should be disregarded and the true relationship of the parties arrived at from considering all the facts and circumstances in order to determine the question of liability.

■ It appears to this Court that the evidence discloses clearly that the driver, Pearman, during the course of the trip in question was actually the servant of two masters, O'Boyle and Maybelle, being subject to limited control from each.

Maybelle and O'Boyle are competing truckers, both deriving profit from the transportation of petroleum products. At the time this explosion occurred this driver was furthering the profit-making interests of both O'Boyle and Maybelle. The revenue division between the two companies was in a percentage of ninety percent (90%) to ten percent (10%), but the net profit realized by the two companies was in a more equal relation. Maybelle's ninety percent (90%) of the revenue was burdened by the expenses of the operation, such as the driver's salary, equipment depreciation, etc. O'Boyle's ten percent (10%), on the other hand, is only lightened by the general office expenses incurred in connection with the collection of the transportation charges.

Each company, Maybelle and O'Boyle, exercised several of the principles said to be indicia of the master-servant relationship. See 12 M.N., Master and Servant, § 3, 4; Phillips v. Brinkley, 194 Va. 62, 72 S.E.2d 339. The driver was selected and hired by Maybelle, and trained by Maybelle; he was covered under Maybelle's workman compensation plan. His salary was paid by Maybelle. The power to dismiss the driver was in Maybelle. But O'Boyle likewise had the power to accept or reject this driver on this particular trip. The most significant element is the power of control, however, and unquestionably, this driver was acting under the authority and control of both Maybelle and O'Boyle. He was driving a Maybelle truck displaying an O'Boyle license—presenting dual authority to the general public. Although not

exercised by O'Boyle, O'Boyle undoubtedly had the power to stop the delivery at any time. To comply with the rules and regulations of the Interstate Commerce Commission, O'Boyle had to assume and have responsibility because it was O'Boyle (not Maybelle) that had the right and authority to transport gasoline in interstate commerce. Whenever it—O'Boyle—exercised this right by joining for compensation with another company, then it follows that O'Boyle must also share in the responsibility with such other company.

This Court had been urged by counsel for O'Boyle to declare that the driver was the servant of Maybelle under the authority of War Emergency Co-Op. Ass'n v. Widenhouse et al., 169 F.2d 403 (4th Cir. 1948), and consequently that Maybelle was primarily, and O'Boyle was secondarily, liable for the damages. Because of the differences in the relationships between the parties in the Widenhouse case and the one at bar, the same result was not merited.

The Cooperative was chartered by Widenhouse and other truckers specifically for the purpose of obtaining a license to operate their trucks in interstate commerce. The Co-Op. had no existence outside of its described relationship with these truckers who chartered it. The Co-Op. owned no equipment in its own name which could be used for the transportation of petroleum products. The court was justified in finding that the driver of the truck was an employee of Widenhouse at the time of the explosion.

In this case, having concluded that the driver was serving two masters in the furtherance of their common interest and purposes, there is not one primarily liable and not one secondarily liable, because when and where there is a common right there must be a common responsibility. Equity demands that there be an equality of burden as to a common right, and it must be remembered, as the court pointed out in Widenhouse, that any right to recover over rests entirely upon equitable principles.

Plaintiff further alleges that the use of the portable pump is sufficient alone to exonerate O'Boyle from any ultimate liability. This contention is without merit. The pump was a minor instrumentality used incidental to the accomplishment of the mission. The evidence shows that the pump was of the type normally used by petroleum products carriers, and this Court does not feel that the hauling of the pump without it being on the bill of lading affects the overall responsibility in this case.

Pearman's negligence occurred as he furthered the interests of his common masters, O'Boyle and Maybelle, and in equity and fairness they both should be liable, and neither should recover over from the other. O'Boyle and Maybelle engaged in the undertaking for their joint benefit. It required the efforts and energies of both to accomplish the task. An unfortunate accident happened in the course of the undertaking, and now each of the parties say the other should be held responsible.

It would indeed be difficult to figure out who profited most from the small transportation bill, but that is not the test. Concert of action and community of interest in getting the job properly done are present. The efforts and services of each joined together in accomplishing the task—albeit an unfortunate experience, but when two or more parties join their talents and resources for mutual gain, they also join them for possible mutual loss.

U.S.C.A., Title 49, § 315, provides that "No certificate or permit shall be issued to a motor carrier * * * unless such carrier complies with * * * regulations as the Commission shall prescribe * * * conditioned to pay * * * any final judgment * * * resulting from the negligent operation * * * of motor vehicles under such certificate * * * for loss or damage to property of others. * * *"

The annotations under this provision of the Code have been noted, and other independent research made, but thus far we have not found the same factual

situation that exists here. Quite true, the Widenhouse case is a near miss, but when it comes to the real point of recovery over and what constitutes a countervailing equity, the answer is not found in the Widenhouse case.

Unlike Widenhouse, there was no meeting of the minds on who was to provide and pay for the public liability insurance. The Maybelle-O'Boyle operation was not a lease in the true sense of the word, although a written form was used for convenience to outwardly satisfy requirements of the I.C.C. At most there was only an arrangement between two trucking companies whereby they could jointly achieve the result of delivering gasoline in interstate commerce. One party held the order for gasoline and owned the equipment—the other held the permit and authority, and this situation quite naturally lent itself to a joint venture.

They combined their resources and services—Maybelle's equipment and regular driver, Pearman—O'Boyle's I.C.C. permit, vehicle identification markers, and services on bill of lading, bookwork, etc.—and thereupon they set out together to accomplish the desired end of delivering gasoline from North Carolina to Virginia. Both Maybelle and O'Boyle knew that each company had public liability insurance protection and neither participant in the joint undertaking gave a thought as to which insurance company would shoulder the burden of public liability in the event of an accident.

We are conscious of the Biblical adage that a person cannot be the servant of two masters, and ordinarily we know this to be quite true, but as is said in 56 C.J.S. § 2, p. 37, under the topic of Master and Servant, " * * * and under some circumstances a person may have two different employers concerning whom his rights may differ. Thus a person may be the servant of two masters at one time and as to one act, even though they are not joint employers, provided the service to one does not involve abandonment of the service to the other."

(Citing, Walling v. Wabash Radio Corp., D.C.Mich., 65 F.Supp. 969; Meridian Taxicab Co. v. Ward, 184 Miss. 499, 186 So. 636, 120 A.L.R. 1346.)

In view of all the circumstances, the two companies, through their respective insurance carriers, should share the burden equally. No other rule of liability would be fair or equitable. An order will be entered declaring that the insurance carriers for plaintiff and defendant shall each bear one-half of the liability which may be established by reason of the negligence of Pearman in the accident of July 10, 1961.