**In re Richard G. STOKES, Debtor.**

**Richard G. STOKES, Plaintiff and Counterclaim Defendant,**

**v.**

**Diana J. FIRESTONE, a/k/a Diana Stokes and Lone Stone, L.C., Defendants and Counterclaim Plaintiffs.**

Civil Action No. 95–1158–A.
Bankruptcy No. 92–14644–AT.
Adv. No. 92–1481.

United States District Court,
E.D. Virginia,
Alexandria Division.

May 31, 1996.

Richard C. Sullivan, Hazel & Thomas, P.C., Alexandria, Virginia, for Richard Stokes.

Michael McGettigan, Murphy, McGettigan, Richards & West, P.C., Alexandria, Virginia, Michael J. Wendorf, Shaw, Pittman, Potts & Trowbridge, Alexandria, Virginia, for Diana Firestone.

## MEMORANDUM OPINION

PAYNE, District Judge.

Richard G. Stokes appeals from the judgment of the United States Bankruptcy Court for the Eastern District of Virginia denying his Motion to Set a New Trial Date and granting the Cross Motion for Specific Per-

formance of the Settlement and Asset Disposition Agreement filed by Lone Stone, L.C.

## STATEMENT OF FACTS

Stokes and Lone Stone are parties to a Settlement and Asset Disposition Agreement (the "Settlement Agreement") dated January 20, 1994. The Settlement Agreement represents a compromised resolution of an underlying adversary proceeding initiated in the Bankruptcy Court and provides for the disposition of a 720 acre parcel of real estate located in Loudoun County, Virginia which is known as Shenstone Farm. Before turning to the principal issues presented by the appeal, it is necessary briefly to recount the circumstances which led to execution of the Settlement Agreement.

### The Underlying Facts

Stokes formerly was married to Diana J. Firestone. Stokes and Firestone each own an undivided one-half interest in Shenstone Farm. Lone Stone is the assignee of certain judgment liens against Firestone's interest in that property. In December 1992, after Firestone assigned the judgment liens to Lone Stone, Stokes began the underlying adversary proceeding. His Amended Complaint consisted of seven counts, the first five of which sought relief from, or otherwise affected Lone Stone's judgment liens. The trial of the adversary proceeding was set for January 30, 1994. On the eve of trial, January 28, 1994, the Bankruptcy Court granted Lone Stone's motion for summary judgment, and later that day Stokes and Lone Stone, both acting with the assistance of counsel, entered into the Settlement Agreement which provides, inter alia, for the conveyance of Shenstone Farm to Lone Stone by Stokes and Firestone.

In sum, the Settlement Agreement requires Stokes and Firestone, at closing, to convey their respective undivided one-half interest in Shenstone Farm to Lone Stone by special warranty deeds. The title to the property is subject to exceptions approved by Lone Stone as shown on a Commitment for Title Insurance attached to the Settlement Agreement. For its part, Lone Stone agreed to execute, at closing, an assignment to Stokes of the proceeds of the sale of Shen-

stone Farm. In that regard, Lone Stone, which after closing would be the owner of Shenstone Farm, would have sole authority to market and sell the property provided that during the first fifteen months following closing, Lone Stone was not entitled to sell at a purchase price which would produce net proceeds of less than $3 million unless Stokes consented thereto or unless Lone Stone paid the difference between the sale price and the 50% of the sale price to which Stokes otherwise would have been entitled if the net proceeds were $3 million.

The Settlement Agreement was executed by Stokes and Lone Stone and was approved by the Bankruptcy Court and incorporated into an Order Approving Compromise of Claim and Transfer of Property Free and Clear of Liens and Claims. That Order was entered by the Bankruptcy Court on February 28, 1994.

The dispute which lies at the core of this appeal implicates four provisions of the Settlement Agreement. They are:

First, paragraph 9(d), which explicates the integration clause in paragraph 9(c), states that "[t]his Agreement may not be modified except by the written agreement of Richard G. Stokes and Lone Stone."

Second, the parties agreed in paragraph 9(i) that "[t]ime is of the essence of each and every provision of this Agreement."

Third, paragraph 9(k) provides that:

This Agreement shall become null and void unless the Bankruptcy Court approves all of the terms and conditions contained herein on or before March 5, 1994. Lone Stone and Richard G. Stokes agree to use best efforts to obtain Bankruptcy Court approval of this Agreement. Closing shall occur within ten (10) days following the date upon which an Order of the Bankruptcy Court approving this settlement becomes final but, in any event, Closing must occur on or before March 15, 1994.

Fourth, because the parties were aware of environmental contamination on Shenstone Farm which required remediation, the Agreement provides, with respect to that contamination, in paragraph 9(1) that:

The obligations of Lone Stone hereunder are contingent upon satisfactory completion of the remaining environmental remediation work desired by Lone Stone at Shenstone Farm.

It was envisioned by the parties that the environmental work could be completed in time to permit closing to occur on or before March 15, 1994, some six weeks after the Settlement Agreement was executed and approximately two weeks after it was approved by the Bankruptcy Court. It was envisioned that Stokes would continue to occupy Shenstone Farm for the purpose of maintaining its "as is" condition until closing. It was also agreed that "[a]ll costs and expenses arising out of or relating to the operation, use, maintenance, marketing and occupancy of Shenstone Farm, including, but not limited to, real estate taxes and insurance premiums, through the date of Closing shall be borne solely by Richard G. Stokes without contribution by Lone Stone." (Settlement Agreement at ¶ 4.) However, the Settlement Agreement also provided that:

Lone Stone and Richard G. Stokes shall each be responsible for payment of one-half of the operating, maintenance, marketing, repair and replacement costs, including capital expenditures deemed necessary to protect or preserve Shenstone Farm, and the costs of real estate taxes and casualty and liability insurance premiums accrued and incurred after the date of Closing through the sale of Shenstone Farm (the 'Maintenance Expenses').

*Id.* The parties anticipated that the "Maintenance Expenses" would be approximately $100,000 during the year following closing and an escrow account was established in the amount of $50,000 to be funded at closing so that Stokes' 50% share of the Maintenance Expenses could be charged against that fund. Thereafter, Lone Stone was to submit invoices to Stokes for his one-half share of the Maintenance Expenses. *Id.*

Notwithstanding the provision of paragraph 9(k), the closing did not occur on or before March 15, 1994 because, as it developed, the remediation of the environmental condition at Shenstone Farm could not be accomplished by that date. That delay was caused by adverse weather conditions and the unavailability of contractors which, in fact, precluded the commencement of that work until March 16, 1994. Thus, on March 14, 1994, Lone Stone's counsel sent a letter to Stokes' counsel [1] which provided:

To follow up on our telephone conversation last week, this letter is to confirm to you in writing that, although Lone Stone, L.C. has been making every effort to have the remaining environmental remediation work on Shenstone Farm completed, due to a series of weather delays, such work has not commenced. In my most recent telephone conversation with a representative of Gordon & Associates [the environmental contractor], I was told that they are now hoping to get on the site tomorrow, March 15, 1994. I expect to have the full results and a certificate of completion of the work ten to fourteen days after commencement. Lone Stone will be prepared to close immediately following the successful completion of such environmental remediation work, in accordance with the terms and conditions of [the Settlement Agreement].

(Plaintiff's Ex. 2.) By letter dated March 25, 1994, Stokes' counsel submitted a number of questions to counsel for Lone Stone including the query:

Do you have a proposed date for closing on the Shenstone sale; where are we on the environmental work?

(Plaintiff's Ex. 2, Letter, Schmitt to Weaver, March 25, 1994.)

On the same date, counsel for Lone Stone sent a letter stating that:

The environmental condition indicated is not satisfactory to Lone Stone, L.C. Lone Stone, L.C. is concerned about the foregoing which obviously impacts the planned conveyance of the property in accordance with [the Settlement Agreement].

(Plaintiff's Ex. 3, Letter from Weaver to Schmitt and McGettigan, March 25, 1994). The environmental report which was delivered as an enclosure to the letter recom-

---

1. At the time Stokes' counsel was Ann E. Schmitt of Reed, Smith, Shaw and McClay in Washington, D.C. Subsequently, Stokes employed other counsel.

mended: (1) that the discovered release of environmental contaminants be reported to the Virginia Department of Environmental Quality ("VDEQ") immediately; and (2) the performance of extensive investigatory work at an estimated cost of $15,000 to $20,000.

Notwithstanding this exchange of correspondence and their awareness of the circumstances, the parties did not discuss or specify a new closing date. But, both were aware that the environmental contamination was more extensive than had been anticipated when the original March 15, 1994 closing date was established.

On March 30, 1994, Stokes submitted the Debtor's First Amended Plan Of Reorganization for approval by the Bankruptcy Court. That plan explicitly provided for satisfaction of the Settlement Agreement as part of the proposed reorganization. Also, on March 30, 1994, the Bankruptcy Court entered an Order Confirming Amended Plan Of Reorganization. Thus, with full knowledge of the terms of the Settlement Agreement providing that time was of the essence and requiring a closing not later than March 15, 1994, and fully aware of the proposed extensive remediation and that the remediation had not been completed, Stokes sought confirmation of a plan for reorganization which included performance of the Settlement Agreement. This amounts to an agreement on March 30, 1994 to an extension for a reasonable time of the closing to permit satisfaction of the environmental contingency provided in paragraph 9(1) of the Settlement Agreement.

The record does not reflect what transpired between Stokes and Lone Stone for some time thereafter. However, Lone Stone's counsel, John Weaver, testified at the hearing before the Bankruptcy Court that, in his view, both parties assumed that remediation would occur within four to six weeks after March 30.

On May 10, 1994, Lone Stone's counsel sent a letter to counsel for Stokes advising that the engineering work for the remediation task was expected to cost at least $15,-400 and offered to split the cost equally between Lone Stone and Stokes. Also, in that letter, counsel for Lone Stone recited his understanding of a conversation held a few days before, stating that:

> On Friday, you indicated to me that, although you were not sure what Mr. Stokes would ultimately agree to pay, you could commit to only $2,133.00 of the aggregate (⅛ of the additional estimate only). *You also suggested that what was important was to go ahead with the work and we could settle the issue of payment later.*

(Plaintiff's Ex. 4, Letter, Weaver to Cahill, May 10, 1994.) (Emphasis added.) Cahill responded on May 18, 1994 reporting Stokes' position:

> I spoke to Mr. Stokes and he has agreed that if Lone Stone is responsible for the first $9,000 of the charges of William H. Gordon and Associates relating to environmental analysis at Shenstone Farm, he will be responsible for the additional charges up to a maximum of $9,000 for the work that has been described by Gordon and Associates in his proposal of March 30, 1994.

(Plaintiff's Ex. 5, Letter, Cahill to Weaver, May 18, 1994.)[2] The previous day, counsel for Stokes had sent to counsel for Lone Stone a list of several items requiring consideration by Lone Stone pending completion of the environmental work and ultimate closing. (Plaintiff's Ex. 6, Letter, Cahill to Weaver, May 17, 1994.)

On May 27, 1994, Weaver informed Cahill that additional remediation work at Shenstone Farm probably could be scheduled for the end of the following week and also addressed payment of a then current tax bill. (Plaintiff's Ex. 8, Letter, Weaver to Cahill,

---

**2.** The letter also contains the following statement:

> As you know, I have previously advised Mr. Nichols that we cannot complete the work within the time frame stated in his letter and have asked that he authorize additional time. However, we need to address this issue as quickly as possible.

The record does not disclose the identity of Mr. Nichols. Nichols was the Ground Water Manager of the VDEQ who was handling the remediation on behalf of the state. (Defendant's Ex. N, Letter, Nichols to John Rahill [sic], April 18, 1994.)

May 27, 1994.) On several occasions during June and July, there were discussions between Weaver and Cahill respecting amendment of the Settlement Agreement "to reflect the delay caused by the environmental conditions at Shenstone Farm." *See, e.g.,* Plaintiff's Ex. 13, Letter, Weaver to Cahill, July 25, 1994. Remediation work was performed in June and August and completed in September, 1994. (Tr. at 29.)

On June 20, 1994, Stokes' counsel and Schmitt, advised John Weaver, counsel for Lone Stone, that a lawyer at the firm of Hazel & Thomas (Bruce Christman) would "be handling the closing, assuming the environmental and tax questions are resolved." (Plaintiff's Ex. 11, Letter, Schmitt to Weaver, June 20, 1994.) On September 23, Cahill advised Weaver that:

> I will be leaving the firm [Hazel & Thomas] to take a position with private industry. I have asked Mike Banzhaf and Karen Fagelson of our Leesburg office to assume responsibility for completing the environmental remediation and closing this matter.

*Id.*

On August 8, 1994, counsel for Stokes submitted to the Bankruptcy Court an interim fee application representing that "settlement should be consummated shortly upon the approval of the requisite environmental activity." Subsequently, Lone Stone's consultants prepared a report explaining that the discharge at Shenstone Farm had been substantially remediated. The report was completed in late October or early November and Stokes was informed that the report was completed.

Thus, it appears that, as of the end of September, 1994, Stokes and Lone Stone and their counsel were of the same mind, that remediation would be completed shortly and that the closing would occur immediately thereafter. Then, on October 19, 1994, Cahill's replacement as counsel for Stokes, Michael Banzhaf, appears to have embarked on a somewhat different course. (Plaintiff's Ex. 12, Letter, Cahill to Banzhaf, October 20, 1994.) The record reflects that, after Banzhaf was retained as counsel by Stokes, there ensued a dispute over the extent of Stokes'

obligation for payment of the environmental consultants' fees. That dispute precipitated an immediate disintegration in what otherwise appeared to be a transaction which, by mutual agreement, was headed for closing as soon as the environmental remediation measures required by Lone Stone and contemplated by paragraph 9(1) of the Settlement Agreement were completed.

However, on November 3, 1994, Stokes, through Banzhaf, asserted for the first time that he considered the Settlement Agreement to have lapsed and announced a desire to partition Shenstone Farm. The idea of partition previously had surfaced in the October 19 telephone conversation between Banzhaf and Weaver. According to Stokes' brief on appeal, "[i]n November, Stokes determined that the delay in closing had so altered the transaction that it no longer made economic sense for him to close on the [Settlement] Agreement". (Stokes brief at 7.) On the next day, November 4, 1994, Stokes filed a Motion for Hearing to Set New Trial Date.

On November 28, 1994, Stokes paid his share of the additional remediation costs and subsequently forwarded the test results to the VDEQ requesting a closure letter. Acquisition of the closure letter was a prerequisite to closing on Shenstone upon which Lone Stone continually insisted until the hearing before the Bankruptcy Court when Lone Stone, through the testimony of Weaver, foreswore insistence upon that requirement.

Lone Stone opposed the request to put the matter back on the trial docket and filed a Cross Motion for Specific Performance. Having reviewed the documentary evidence and following the hearing on February 1, 1995, the Bankruptcy Court denied Stokes' motion to set a new trial date and granted Lone Stone's motion for specific performance.

**The Decision Of The Bankruptcy Court**

Following evidentiary hearings, the Bankruptcy Court held that:

> Stokes and Lone Stone, by informal agreement and their course of conduct, agreed to extend the deadline for closing defined in paragraph 9(k) for a reasonable time beyond March 15, 1994, because both

Stokes and Lone Stone assumed that the remediation desired by Lone Stone could be completed quickly and that only an extension of perhaps a couple of weeks would be necessary. However, the parties did not discuss, specify, or agree on a new closing date. *Stokes v. Firestone*, Adv.Pro. 92–1481–AT, p. 5 (Bankr.E.D.Va. April 19, 1995). The Bankruptcy Court also found that Stokes and Lone Stone "agreed that the additional remediation work should be done and that, upon completion, a closure letter from VDEQ would be requested." *Id.* at 6. Further, the Bankruptcy Court determined that Stokes had agreed to pay up to $9,000 for remediation work; that the remediation work was done with Stokes' knowledge; that it was completed on September 1, 1994; and that:

> [u]ntil Stokes' letter dated November 3, 1994, it is clear that all parties were working toward closing. Prior to November 3, 1994, debtor's [Stokes] counsel had never informed Lone Stone of the position that the agreement had died, and Stokes and his counsel acted at all times consistent with the Agreement.

*Id.* at 6–7.

On the basis of those findings, the Bankruptcy Court concluded that it had the authority under 11 U.S.C. § 105(a) to enforce Settlement Agreement in the exercise of the equitable powers conferred by § 105(a). Additionally, the Bankruptcy Court, applying principles of Virginia law, concluded that Stokes had waived the closing date; that he and Lone Stone had informally agreed to extend the closing for a reasonable time; and that "Stokes and Lone Stone treated the [Settlement Agreement] as valid and in force until at least November 3, 1994." Thereupon, the Bankruptcy Court determined that, under Virginia law, specific performance was appropriate.

On appeal, Stokes argues that the Settlement Agreement lapsed because the parties failed to establish a time after March 30, 1994 for closing, and that, even if there was an extension of the closing date, the extension expired before Stokes moved for a new trial on November 3, 1994. Stokes also asserts that Lone Stone neither alleged nor

proved an inadequate remedy at law thereby precluding specific performance; that specific performance is not available because the Settlement Agreement is not complete; and that, in any event, the Settlement Agreement cannot be specifically enforced because of changed circumstances, namely, the fact that Stokes incurred additional carrying costs between March 15 and November 3, 1994.

## DISCUSSION

A district court possesses inherent jurisdiction and equitable power to enforce agreements entered into in settlement of litigation before that court. *Ozyagcilar v. Davis*, 701 F.2d 306 (4th Cir.1983). That power extends, however, only to the enforcement of complete settlement agreements and, conversely, does not permit a court to impose a settlement agreement where there was never a meeting of the minds of the parties. *Wood v. Virginia Hauling Co.*, 528 F.2d 423, 425 (4th Cir.1975). In determining whether a settlement agreement existed, the Bankruptcy Court was obligated to apply principles of state contract law. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir.1990); *Martinson v. Towe*, 1994 WL 486862 (D.Mont. March 23, 1994); *Echols v. Nimmo*, 586 F.Supp. 467, 469 (W.D.Mich.1984).

Where, as here, a settlement agreement is executed under the auspices of the Bankruptcy Court, is approved by that court, and subsequently becomes a basis for an order confirming a proposed plan of reorganization, the Bankruptcy Court undoubtedly has jurisdiction to enforce the Settlement Agreement under the foregoing principles as well as pursuant to the powers conferred upon the Bankruptcy Court pursuant to 11 U.S.C. § 105(a). Under that section, the bankruptcy courts have injunctive powers which include the power to issue a decree of specific performance of a contract. Of course, Section 105(a) does not "authorize the bankruptcy court to create substantive rights that are otherwise unavailable under applicable law, [nor does it] constitute a roving commission to do equity." *United States v. Sutton*, 786 F.2d 1305 (5th Cir.1986) (citing *Johnson v. First Nat. Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied,*

465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *In re Texas Consumer Fin. Corp.*, 480 F.2d 1261, 1265 (5th Cir.1973)). Thus, the decision of the Bankruptcy Court to rely on its powers under section 105(a) depends, in the first instance, upon whether there was a complete settlement agreement which was susceptible to enforcement.

■ In this action, the resolution of that inquiry depends upon the significance of paragraph 9(d) of the Settlement Agreement, which provides that time is of the essence and paragraph 9(k) which requires that closing occur in any event by March 15, 1994. Those clauses cannot be construed in a vacuum because they are part of a complete contract and must be taken in perspective of the contract as a whole, giving effect to all its terms. *Huddleston v. Mariotti*, 143 W.Va. 419, 102 S.E.2d 527, 529 (1958); *Southwest Virginia Hosp. v. Lipps*, 193 Va. 191, 68 S.E.2d 82, 90–91 (1951); *Worrie v. Boze*, 191 Va. 916, 62 S.E.2d 876, 880 (1951). Also, because the enforcement of a settlement agreement involves the exercise of the court's injunctive and equitable powers, the entire circumstances surrounding the execution of the contract, its objective, and the effects of the exercise of the court's injunctive powers must be taken into account.

■ Here, there is undoubtedly a complete agreement because on January 28, 1994, the parties executed the Settlement Agreement which was approved on February 28, 1994 by the Bankruptcy Court. On both occasions, the event of execution and the Bankruptcy Court's approval, the parties contemplated that the contingency which would activate Lone Stone's obligation—environmental remediation of the property—would be completed by March 15, 1994. Thus, although the agreement, by its nature, required satisfaction of a condition subsequent, the agreement between the parties was complete in the sense that its terms had been defined.

As the events described in the Statement of Facts unfolded, a fundamental assumption of the parties respecting the date of closing began to erode and it soon developed that the contingency which would activate Lone Stone's obligations under the contract would

not occur by the date provided for the closing in paragraph 9(k). Upon learning of the impossibility of satisfying that contingency, counsel for Stokes queried counsel for Lone Stone on March 25 regarding the status of the environmental work and asked when a new closing date would be set. On the same date, counsel for Lone Stone informed counsel for Stokes that the environmental work was more extensive than anticipated by providing a report from their environmental consultants which called for substantial investigatory work. Beyond question, both Stokes and Lone Stone then knew that substantial work remained to satisfy the contingency.

■ With full knowledge of that circumstance, Stokes and his counsel submitted, and obtained approval of, the Debtor's Plan of Reorganization on March 30, 1994 and the Settlement Agreement was explicitly referenced in the Order. Thus, the Bankruptcy Court clearly was correct in concluding that Stokes waived the benefit of paragraph 9(d) (the "time of the essence" clause) and paragraph 9(k) (setting the closing date of March 15) because, even where time is of the essence, the parties may waive the specified date by subsequent conduct in treating the contract as still in force. *Hamilton v. Newbold*, 154 Va. 345, 153 S.E. 681, 683 (1930); *Sims v. Nidiffer*, 203 Va. 749, 127 S.E.2d 85, 87 (1962).

■ However, that finding does not resolve the issue whether the contract was in force in November 1994 because, where parties to a contract waive an agreed upon closing date without substituting a new date, the law implies that the condition must occur within a "reasonable time period." "Settled contract law implies a reasonable time limitation for performance of conditions in contracts for the sale of land where no time for performance is fixed by the contract itself." *Long Signature Homes v. Fairfield Woods, Inc.*, 248 Va. 95, 445 S.E.2d 489, 492 (1994) (citations omitted).

■ The record here establishes that the time limit against which the parties were operating was the completion of the environmental remediation work by the consultants

and the issuance of the closure by VDEQ. Because there was no time explicitly agreed upon by Stokes and Lone Stone, the law implies a reasonable time limit for that condition to occur. *Huselton v. Roop*, 215 Va. 127, 207 S.E.2d 826, 827 (1974); *Appalachian Power Co. v. John Stewart Walker, Inc.*, 214 Va. 524, 201 S.E.2d 758, 767 (1974). What is a reasonable time under the circumstances is a question of fact, and in making that determination a court must consider the nature of the proposed contract, the purposes of the parties, the course of dealings between them, and the relevant usage of trade. Restatement (Second) of Contracts § 41(2) & cmt. b; *see also Ryland Group, Inc. v. Wills*, 229 Va. 459, 331 S.E.2d 399, 404 (1985) ("[t]hat the parties contemplated performance within a commercially reasonable period is demonstrated by their provision that time was of the essence.")

The record is unclear respecting what Stokes' understanding was as to the time required for completion but he offered no evidence to dispute the testimony of Lone Stone's counsel, John Weaver, who stated that, in his view, both parties understood that remediation would occur within four to six weeks from the time the plan of reorganization was approved on March 30. Within that time frame, however, counsel for Lone Stone sent a letter to counsel for Stokes informing him of the need for additional remediation work expected to cost approximately $15,000. The logical inference to be drawn from that request is that added time also would be required. Stokes' counsel took the position that it was important to "go ahead with the work" with the understanding that "we could settle the issue of payment later." In any event, by May 18, 1994, Stokes had approved the performance of the remediation work and had agreed to provide up to $9,000 toward the cost of remediation after Lone Stone paid the initial $9,000. Discussions of this matter continued through June and August, 1994. On August 8, 1994, Stokes' counsel informed the Bankruptcy Court that the settlement should be consummated shortly. In fact, the remediation work was completed in September, and by the end of September, Stokes' lawyer was clearly contemplating closing in the very near future.

Thus, the parties demonstrated by their conduct that they clearly understood that completion of remediation and securing a letter of closure from VDEQ was required to satisfy the contingency and that the closing would occur as soon as that could be accomplished. Both parties understood that there was uncertainty respecting when these objectives could be achieved but were working toward concluding it on an expedited basis. Significantly, before the remediation work was concluded and even when he was applying for a closure letter, Stokes never complained that the schedule was unreasonable or unachievable or otherwise unacceptable. To the contrary, he allowed the work to continue, participated in assessing the need for the work and in obtaining the closure letter, and even agreed to pay for half of the work. Under these circumstances and on this record then, the reasonable time supplied by the law for satisfaction of the contingency as well as the closing was the time reasonably required for achievement of the remediation and the securing of the closure letter. It is unnecessary that there be a fixed date to demark that event so long as the parties were continuing to work toward that end with full knowledge that they had not reached a fixed date to achieve it. That is especially true where, as here, the remediation was completed before Stokes reversed course and contended, for the first time in November 1994, long after the completion of the remediation, that the contract had lapsed in March for failure to close within the time required by the contract, March 15, 1994, (or—as appears to be his fallback argument in one of the briefs—by March 30, 1994).

Although not addressed by the Bankruptcy Court's Memorandum Opinion, Lone Stone asserts that Stokes is estopped to assert any right he had to insist upon adherence to the provisions of paragraph 9(d) or 9(k) because of his conduct and his silence. Because estoppel is an equitable defense which precludes assertion of a contract right, the court must look to Virginia contract law to assess the merits of Lone Stone's estoppel contention.

■ Equitable estoppel, or estoppel *in pais,* is an estoppel which prevents a party from denying that which, by his own conduct, he has induced others to act upon as true. *See Harris v. City of Roanoke,* 179 Va. 1, 18 S.E.2d 303, 305 (1942). That doctrine extends without limitation throughout the law of Virginia. Under Virginia law, it is settled that:

> The general rule of equitable estoppel, or as it is frequently called, 'estoppel *in pais,*' is that when one person, by his statements, conduct, action, behavior, · concealment, *or even silence,* has induced another, who has a right to rely upon those statements, etc., and who does rely upon them in good faith, to believe in the existence of the state of facts with which they are compatible, and act upon that belief, the former will not be allowed to assert, as against the latter, the existence of a different state of facts from that indicated by his statements or conduct, if the latter has so far changed position that he would be injured thereby.

*Heath v. Valentine,* 177 Va. 731, 15 S.E.2d 98, 100 (1941) (citations omitted) (emphasis added).

■ Thus, it is also true that where one party to a transaction induces another to act upon the reasonable belief that he has waived or will waive certain rights, remedies, or objections, which he is entitled to assert, the latter party is estopped to insist upon those rights, remedies or objections where to do so would prejudice the party who has been misled. *C.S. Luck & Sons v. Boatwright,* 157 Va. 490, 162 S.E. 53 (1932). The estoppel is no broader than that necessary to place the party entitled to the benefit of a doctrine in the same position as if that on which he had relied had been true, *Anderson v. Phlegar,* 93 Va. 415, 25 S.E. 107 (1896), and the estoppel must be shown by clear, precise and unequivocal evidence. *Heath,* 15 S.E.2d at 101. And, it is settled in Virginia law that silence and passive acquiescence can operate as estoppel. *National Airlines v. Shea,* 223 Va. 578, 292 S.E.2d 308 (1982); *Moore v. Hermitage Realty Inv. Corp.,* 145 Va. 199, 133 S.E. 881 (1926). Of course, estoppel by silence arises only where there is a right and a duty to speak and knowledge of the circumstances requiring him to speak. *Chesapeake & O. Ry. Co. v. Walker,* 100 Va. 69, 40 S.E. 633 (1902); *Cantrell v. Booher,* 201 Va. 649, 112 S.E.2d 883 (1960).

■ The Bankruptcy Court did not decide the issue of estoppel. Rather, it decided the more limited question whether Stokes had waived his rights under paragraph 9(k) to a closing of the transaction on March 15, 1994. As explained above, that finding is beyond cavil, but it is not dispositive of the issue here presented which is whether Stokes is estopped to claim that the delay after March 30, 1994 was not a reasonable one under the circumstances as of November 3, 1994, when he suddenly declared that the contract had lapsed. Where, as here, the factual record is clear, the decision of the Bankruptcy Court can be sustained on any basis which appears in the record. *See, e.g., University Club v. City of New York,* 842 F.2d 37, 39 (2d Cir.1988); *United States v. Johnson,* 54 F.3d 1150, 1156 (4th Cir.1995). That being so, a thorough examination discloses that the decision of the Bankruptcy Court may be sustained here because Stokes is estopped to assert that the time allowed for satisfaction of the contingency required by paragraph 9(1)—environmental remediation to Lone Stone's satisfaction—was not reasonable under the circumstances.

Stokes entered the contract knowing that the contingency had to be satisfied and that it was central to the willingness of Lone Stone to close on the transaction. Before expiration of the closing date specified by paragraph 9(1), counsel for Stokes was informed that the remediation could not be accomplished within the time frame provided by the contract. Eleven days later, on March 25, 1994, Stokes' counsel queried counsel for Lone Stone respecting a proposed date for closing and inquiring about the status of the environmental work. On the same day, counsel for Lone Stone informed counsel for Stokes that the environmental condition would require extensive investigatory work, costing $15,000 to $20,000, and the report which was enclosed portended substantial delay until that work could be accomplished.

With full knowledge of those circumstances, five days later, Stokes and his counsel submitted for, and received, judicial approval of Stokes' plan of reorganization which explicitly provided for satisfaction of the Settlement Agreement. By May 10, 1994, the particulars of the environmental work were known and the cost was estimated to be approximately $15,000. The parties reached, on May 18, 1994, an agreement respecting division of the costs of the environmental work and the closing. Counsel for Stokes was kept apprised fully of the development of the environmental work most of which occurred in June and August. On August 8, 1994, with full knowledge of the status of the environmental work which had been completed and which was under way, counsel for Stokes represented to the Bankruptcy Court that "settlement should be consummated shortly upon the approval of the requisite environmental activity." All remediation was completed by September, 1994.

Stokes thus had knowledge of circumstances requiring him to speak if he believed that the contract had lapsed or if he intended to object to closing upon completion of the environmental work underway during the summer of 1994. The frequent exchanges between counsel for the parties, recited in the Statement of Facts, show that Stokes had a duty to voice any objection to the process or any interpretation of the contract which would impede satisfaction of the contingency inserted in the contract for Lone Stone's benefit. Had Stokes taken such an action, Lone Stone could have refused to proceed with the environmental work and could have declared that the contingency which enured to its benefit was unsatisfied, thereby putting Stokes in breach of the agreement. This, of course, would have subjected Stokes to liability in the adversary proceeding which the Settlement Agreement had precluded. It was to Stokes' benefit not to expose himself to those consequences. On this record, the Court has no difficulty in concluding that Stokes is estopped by his conduct and his silence from asserting that the remediation work was not completed within a reasonable time and that closing was not required to be accomplished within a reasonable time.

Although the environmental work was completed by September 1994, six weeks or so before Stokes' drastically reversed course, the other contingency upon which closing was predicated, namely the acquisition of the VDEQ letter, had not been completed at that time. Lone Stone insisted upon a letter of closure from VDEQ, as was its right under paragraph 9(1), until the hearing before the Bankruptcy Court. That insistence is certainly not unreasonable considering that it was the accepted mode of concluding environmental remediation programs at the time. Although the closure letter had not been received by November 3, 1994, Stokes also is estopped to complain about the effect of the delay in securing the closure letter from VDEQ for the same reasons articulated above. In any event, Lone Stone has waived insistence on that closure letter so the point is moot.

■ Stokes also makes much of the fact that the Settlement Agreement cannot be specifically enforced. Once again, the Court is guided by principles of Virginia law respecting specific performance of contracts because a request for an Order enforcing this Settlement Agreement necessarily involves specific performance of a land sale contract. Those principles fully warranted the Bankruptcy Court's Order directing specific performance on the facts presented here.

■ Specific performance, of course, is a matter addressed to the discretion of the court, and under Virginia law, "where the contract sought to be enforced is proved and is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree specific performance as it is for a court of law to give damages for breach of it." *Haythe v. May,* 223 Va. 359, 288 S.E.2d 487, 488 (1982) (quoting *Pavlock v. Gallop,* 207 Va. 989, 154 S.E.2d 153, 157 (1967)). Accordingly,

> When the contract sought to be enforced ... has been proven by competent and satisfactory evidence, and there is nothing to indicate that its enforcement would be inequitable to a defendant, but will work injury and damage to the other party if it should be refused, in the absence of fraud,

misapprehension, or mistake, relief will be granted by specific performance.

*Manassas v. Board of County Supervisors,* 250 Va. 126, 458 S.E.2d 568, 572 (1995) (quoting *First Nat. Bank v. Roanoke Oil Co.,* 169 Va. 99, 192 S.E. 764, 771 (1937)).

■ The contract here fulfills all the requisites for specific performance under Virginia law. It is definite. It is proven by competent evidence. There is nothing to suggest that enforcement would be inequitable to Stokes and the record clearly demonstrates that a failure to enforce the contract would work injury and damage to Lone Stone who is guilty of neither fraud, misrepresentation, nor mistake. And, of course, contracts involving the sale of land have always enjoyed a particular amenability to specific performance under Virginia law. *Gaynor v. Hird,* 11 Va.App. 588, 400 S.E.2d 788, 790 (1991); *Hale v. Wilkinson,* 62 Va. (21 Gratt) 75, 80 (1871).

Stokes resists this result by arguing that, while living on Shenstone Farm during the pendency of these proceedings, he has incurred substantial maintenance and other expenses which are not contemplated by the Settlement Agreement because the Settlement Agreement was structured in contemplation of a brief period of time between its approval and closing. This argument ignores the provisions of paragraph 4 of the Settlement Agreement which provides that "[a]ll costs and expenses arising out of or relating to the operation, use, maintenance, marketing and occupancy of Shenstone Farm, including, but not limited to, real estate taxes and insurance premiums, through the date of closing shall be borne by Richard G. Stokes without contribution by Lone Stone." The Settlement Agreement could not contain a more clear and definite requirement that these expenses are to be borne exclusively by Stokes. Moreover, Stokes cannot be heard to complain about the expenses which have mounted during these proceedings, because shortly after his reversal of course, on November 3, 1994, and after his refusal thereupon to execute the Settlement Agreement, Stokes occupied Shenstone Farm and has enjoyed the use and benefit thereof throughout the pendency of the litigation he instituted following his unwarranted, unjustified, and legally insupportable change of direction. The consequence which he bears for having made that decision is explicitly covered by paragraph 4 of the Settlement Agreement. Thus, the presence of those expenses does not preclude a decree of specific performance here because the Settlement Agreement clearly allocates responsibility for them to Stokes.

■ Finally, Stokes argues that discussions respecting certain releases respecting Firestone preclude the grant of specific performance. That argument is based on the fact that counsel for Lone Stone and counsel for Stokes were discussing revisions to the releases, forms of which were approved, as part of the Settlement Agreement and were attached thereto. Of course, those releases were approved by the Court on February 28, 1994, and became part of the plan of reorganization approved on March 30, 1994. Consequently, subsequent discussions respecting the form of the release do not stand in the way of specific performance. The releases, as incorporated in and as agreed to, in the attachment to the Settlement Agreement are to be executed. If the parties wish to negotiate other terms, they are free to do so, but, that failing, they have already agreed upon terms for releases and they are bound thereby.

## CONCLUSION

For the foregoing reasons, the judgment of the Bankruptcy Court is affirmed.

It is so ORDERED.